```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :

        -v.-                    :
                                      11 Cr. 310 (PGG)
JAVEL TAYLOR,                   :

           Defendant.           :

- - - - - - - - - - - - - - - -x
```

**GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANT JAVEL TAYLOR'S PRE-TRIAL MOTIONS**

```
                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York
                                One St. Andrew's Plaza
                                New York, New York 10007
```

Amy Lester
Ryan P. Poscablo
Assistant United States Attorneys
    -Of Counsel-

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in further opposition to defendant Javel Taylor's motion to suppress physical evidence, statements, and identification evidence. On July 21, 2011, the Court held a suppression hearing (the "Hearing"), at which the Government presented the testimony of three witnesses -- Detective JohnPaul Slater, Detective Daniel Leon, and Police Officer Melvin Mejia, all with the New York City Police Department ("NYPD") -- and introduced three exhibits.

The evidence introduced at the Hearing demonstrated that Taylor's arrest was supported by probable cause and, therefore, the physical evidence seized from his person should not be suppressed. In addition, the Government proved that Taylor's statements to Detective Slater were made voluntarily and spontaneously, and not in response to interrogation, and are therefore admissible. Moreover, the testimony at the Hearing established that the circumstances surrounding the identification of Taylor by the primary undercover officer were not unduly suggestive and, therefore, the defense has not met its burden, and the motion to suppress the identification should be denied. Accordingly, for the reasons set forth below and in the Government's initial memorandum of law, Taylor's pre-trial motions should be denied in their entirety.[1]

---

[1] By separate letter to the Government dated May 25, 2011, Taylor requested, among other things, the immediate disclosure of evidence that the Government may seek to introduce

**EVIDENCE PRESENTED AT THE HEARING**

The evidence presented at the Hearing established that, on the afternoon of March 21, 2011, Detective Slater and the other members of his field team, including Detective Leon, Officer Mejia, and two undercover officers, conducted a buy and bust operation in the Frederick Douglass Houses (the "Douglass Houses") on the Upper West Side of Manhattan, which resulted in the arrests of Javel Taylor and his co-defendant, Leonard Fitzgerald.  Detective Slater was the arresting officer, and Detective Leon and Officer Mejia were in the chase car, with primary responsibility for apprehending the participants in the narcotics transaction.  (Tr. 5, 51, 75).[2]  Before the field team left the station house that day, Detective Slater prepared and distributed the pre-recorded buy money to be used by the primary undercover (the "UC") to purchase crack cocaine during the buy and bust operation.  (Tr. 5, 6).

---

pursuant to Rule 404(b) at trial, disclosure of information relating to co-conspirators and other cooperating witnesses or confidential sources whom the Government may call at trial, and the disclosure of so-called *Brady* and *Giglio* material.  As set forth in the Government's initial brief, the Government will provide such disclosures as required by law and sufficiently in advance of any trial in this case.  With respect to Taylor's request for the disclosure of *Brady* material, that request is moot, as the Government is unaware of any *Brady* material.  However, should the Government discover any *Brady* material, it will be provided to the defense as soon as possible.

[2]   "Tr." refers to the transcript of the Hearing; "GX" refers to the Government Exhibits entered into evidence during the Hearing.

The field team, all of whom were dressed in plain clothes, drove from the station house to the area of the Douglass Houses in unmarked vehicles. (Tr. 7). Detective Slater positioned his car near the intersection of 101st Street and Amsterdam Avenue (Tr. 8), on the western side of the Douglass Houses (Tr. 6, GX 1), while the chase car -- in which Officer Leon and Detective Mejia drove to the scene -- was positioned on the opposite side of the Douglass Houses, on Columbus Avenue in the area of 103rd or 104th Street (Tr. 53, 77). Once the field team arrived at the location, Detective Slater conducted a check of the Kel device[3] worn by the UC, to make sure that it was working. (Tr. 8). In addition to the Kel, each member of the field team had police radios, which enabled them to communicate with each other during the buy and bust operation. (Tr. 9).

As he was sitting in his vehicle on Amsterdam Avenue, Detective Slater received a radio communication from the undercover officer acting as the "ghost" -- whose job it is to ensure the safety of the primary undercover by transmitting information to the field team about the UC's location and the individuals with whom the UC interacts (Tr. 10) -- that led him to drive his car north on Amsterdam Avenue towards 103rd Street (Tr. 9). There, on the corner of Amsterdam and 103rd Street,

---

[3]   The Kel enabled the UC to make verbal transmissions to a receiver in Detective Slater's vehicle. (Tr. 8).

Detective Slater saw the UC engaged in conversation with an individual he later learned was Leonard Fitzgerald.  (Tr. 10).  A few moments later, Detective Slater saw an individual he later learned was Javel Taylor cross from the east side of Amsterdam Avenue to the west side, and approach Fitzgerald on the northwest corner of 103rd Street and Amsterdam.  (Tr. 11).  Taylor was wearing a red hooded sweatshirt, a black leather jacket with an embroidered design on the back, black cargo pants, and black boots.  (Tr. 10-11, 20; GX 2, 3).  After Taylor approached Fitzgerald, the two of them walked east back towards the Douglass Houses.  (Tr. 11).  The UC followed them.  (Tr. 11).  At that point, Detective Slater informed the rest of the field team by radio that two individuals (Fitzgerald and Taylor) were walking back into the Douglass Houses, and provided physical descriptions of the individuals he saw to the field team.  (Tr. 12).  Detective Slater then learned from a transmission from the UC that the UC had provided the pre-recorded buy money to Fitzgerald, and that Fitzgerald and Taylor had entered a building.  (Tr. 12).  When Fitzgerald exited the building, the UC again provided that information to Detective Slater.  (Tr. 12).

      Detective Slater testified that, about a minute later, he received a radio communication that there was a positive buy; in other words, that the UC had successfully purchased crack

cocaine.[4]  (Tr. 12).  Detective Slater also learned from the UC that Fitzgerald's location was approximately mid-block on 104th Street between Amsterdam and Columbus Avenue, on the north side of the street. (Tr. 12-13, 37).  Detective Slater proceeded to that location, stopped Fitzgerald, and placed him under arrest. (Tr. 13).  Fitzgerald had a receipt in his pocket that had the name "Jay" on it, as well as a telephone number.  (Tr. 13-14). The UC later confirmed that the telephone number was the number that Fitzgerald had dialed on the UC's cellular telephone just before the drug transaction took place.  (Tr. 140).  After Fitzgerald was placed under arrest, Detective Slater received additional radio communications from the ghost that Taylor had come out of the building, and he proceeded to 102nd Street and Amsterdam Avenue to assist the officers in the chase car in apprehending Taylor.[5]  (Tr. 14-15, 38).

       Once the positive buy transmission came over the radio, along with a physical description of the individuals involved in the drug transaction, Detective Leon and Officer Mejia stepped out of the chase car and walked into the Douglass Houses.  (Tr.

---

[4]  The UC purchased four ziplock bags of crack with $40 in pre-recorded buy money.  (Tr. 19).

[5]  Detective Slater testified that, by this point, the field team had already divided up responsibilities for apprehending the individuals involved in the drug transaction. Detective Slater was to stop the first person, Fitzgerald, and the chase car was to stop the second person, Taylor.  (Tr. 15).

52, 77-78). Detective Leon walked south on Columbus Avenue towards 102nd Street, where he made a right turn into the Douglass Houses. (Tr. 54). Officer Mejia entered the Douglass Houses at the 103rd Street walkway. (Tr. 78-79). There, Officer Mejia saw an individual who he testified matched the description of one of the individuals who participated in the drug transaction, that is, Taylor, and another individual exiting the building located just northeast of the cul-de-sac at 102nd Street between Amsterdam and Columbus Avenues. (Tr. 79-80, 100; GX 1).[6] Taylor was talking on a cellular telephone. (Tr. 80). Officer Mejia followed them, and saw Taylor hand a package of what appeared to be crack cocaine packaged inside dark-colored ziplock bags, wrapped in Saran wrap, to the other individual, who placed the package in his sock. (Tr. 79, 81-82). Taylor and the other individual then walked to the south side of the building, towards the 102nd Street walkway. (Tr. 83; GX 1).

Around this same time, Detective Leon encountered Taylor, who he testified matched the physical description put over the radio of one of the participants in the drug transaction, and the other individual, on the 102nd Street walkway. (Tr. 54, 55). Detective Leon and Officer Mejia

---

[6] Officer Mejia testified that the description was "for a male black wearing a black letter jacket, dark-colored pants with red design on the back of the jacket" (Tr. 77-78), consistent with the clothing worn by Taylor on March 21, 2011 (Tr. 20; GX 2, 3).

attempted to detain Taylor and the other individual, but the second individual ran off, and Officer Mejia pursued him into Central Park.  (Tr. 55, 83-84).  Although Taylor attempted to escape, after some struggle, Detective Leon was able to place him in handcuffs.  (Tr. 56-57).

When Detective Slater got to the area just east of the cul-de-sac located on 102nd Street between Amsterdam and Columbus, he saw Taylor on the ground, in handcuffs, with Detective Leon standing above him.  (Tr. 15-16, 42, 70).  When Detective Slater approached, Taylor said, in substance, that he ran because he had "bud," meaning marijuana, on him and he threw it.  (Tr. 16).  Detective Slater picked up Taylor's jacket, searched it, and found $45 in United States currency, including the $40 of pre-recorded buy money he had provided to the UC prior to the buy and bust operation.  (Tr. 16, 17).  When he did so, Taylor stated, in substance, "That's not marked money, my sister gave that to me."  (Tr. 16).[4]

After Fitzgerald and Taylor were arrested, the UC confirmed that the field team had placed the correct individuals under arrest by radio transmission to Detective Slater.  (Tr. 17, 18).  In addition, Detective Slater recognized Taylor as the

---

[4]  Detective Slater testified that both of Taylor's statements were spontaneous and were not made in response to any questions asked by himself or other law enforcement officers. (Tr. 17, 43).

7

individual he had seen crossing Amsterdam Avenue to meet up with Fitzgerald on the corner of 103rd Street.[5]  (Tr. 18).

## ARGUMENT

### I. Taylor's Motion to Suppress the Pre-Recorded Buy Money and His Statements to Law Enforcement Should Be Denied

The testimony presented at the Hearing demonstrated that the physical evidence seized from Taylor's person -- the pre-recorded buy money -- was lawfully obtained, because Taylor's arrest was lawful and supported by probable cause.  Moreover, the testimony of Detective Slater established that Taylor's statements to law enforcement were made voluntarily and spontaneously, and were not the product of interrogation.

The evidence at the Hearing amply demonstrated that the members of the field team had probable cause to arrest Taylor for his role in the sale of crack cocaine to the UC on March 21, 2011.  "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested."

---

[5]  Although Detective Slater had heard Taylor's name prior to March 21st in connection with a homicide investigation, Detective Slater made clear that he did not know Taylor's name, nor did he recognize him until after Taylor had been placed under arrest. (Tr. 33, 44, 45, 47).  Moreover, Detective Slater did not instruct the UC to purchase crack specifically from Taylor or any other individual in particular.  (Tr. 48).

*United States* v. *Fisher*, 702 F.2d 372, 375 (2d Cir. 1983); *Brinegar* v. *United States*, 338 U.S. 160, 175-76 (1949) (same). In this case, both Detective Leon and Officer Mejia testified that Taylor fit the description they heard over their police radios of one of the individuals involved in the sale of crack cocaine to the UC. (Tr. 55, 77-78, 80-81). In addition, Officer Mejia saw Taylor pass what he believed was a package of crack cocaine to a third individual, who stored it in his sock. (Tr. 79, 81-82). Under these circumstances, there was certainly a "fair probability" that Taylor had committed or was engaged in committing a narcotics offense, and thus the officers had probable cause to place him under arrest. *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983); *see also United States* v. *Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (probable cause exists "if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed"). Moreover, Taylor's subsequent conduct, specifically, his efforts to run away when Detective Leon attempted to detain him, contributed to the "totality of the circumstances" demonstrating probable cause for his arrest.

The evidence presented at the Hearing also proved that the statements made by Taylor after he was apprehended by

Detective Leon were spontaneous and were not made in response to police interrogation. The protections of *Miranda* apply only where the suspect is "subjected to questioning" by persons the suspect knows are acting on behalf of the state. *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966). As the Supreme Court made clear in *Miranda* itself, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.*; *see also United States* v. *Compton*, 428 F.2d 18, 22 (2d Cir. 1970) ("spontaneous utterance" made by defendant when taken into custody, prior to administration of *Miranda* warnings, admissible because not the result of police interrogation). The Supreme Court defined the term "interrogation" under the *Miranda* rule as "express questioning or its functional equivalent." *Rhode Island* v. *Innis*, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Where there has been no interrogation under this definition, the suspect's statements are admissible even if the suspect was in custody when he made the statements. *Id.* at 300, 302-03. In this case, Detective Slater testified that Taylor spoke voluntarily, not in response to any questions posed by law

enforcement. (Tr. 17, 43). Therefore, there is no basis to suppress Taylor's statements.

## II. Taylor's Motion to Suppress His Identification by the UC Should Be Denied

In his moving papers, Taylor failed to articulate any basis to believe that the circumstances surrounding his identification by the UC were impermissibly suggestive, as he must. *United States* v. *DiTommaso*, 817 F.2d 201, 213 (2d Cir. 1987) (to prevail on challenge to identification evidence, defendant must first make a threshold showing that the surrounding circumstances or actual conduct of the pre-trial identification were "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.") (quoting *Stovall* v. *Denno*, 388 U.S. 293, 302 (1967)) (quotation marks omitted). For this reason alone, the Court should deny his motion.

It is well-settled that, if the defendant fails to carry his burden of making a threshold showing that the surrounding circumstances or actual conduct of the procedures used to secure identifications were unduly suggestive, "the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification. In that circumstance, any question as to the reliability of the witness's identifications goes to the weight of the evidence, not its admissibility." *United States* v. *Maldonado-Rivera*, 922 F.2d

934, 973 (2d Cir. 1990); *see also United States* v. *Bautista*, 23 F.3d 726, 731 n.7 (2d Cir. 1994) (if initial showing of suggestiveness is not made, there is no occasion to consider independent reliability of the identification).  In such circumstances, the inquiry need proceed no further, and no pre-trial hearing is required.  *See, e.g., Sims*, 867 F.2d at 145; *Jarrett* v. *Headley*, 802 F.2d 34, 42 (2d Cir. 1986); *United States* v. *Baccollo*, 725 F.2d 170, 173 (2d Cir. 1983) (no pre-trial proceeding or *voir dire* required before witnesses made in-court identification); *United States* v. *Padilla*, No. S1 94 Cr. 313 (CSH), 1994 WL 681812, at *8 (S.D.N.Y. Dec. 5, 1994) ("In the absence of a sufficient pre-trial showing of impropriety, exploration of the circumstances surrounding the identification procedures may be properly left to cross-examination at trial.").

   Rather, because determinations of reliability are traditionally put to the jury, the Supreme Court has held that conducting such a hearing in the jury's presence is constitutionally permissible.  *Watkins* v. *Sowders*, 449 U.S. 341, 348-49 (1981). The due process rights of defendants and the reliability of the identification evidence can be ensured through the "time-honored process of cross-examination" -- "the device best suited to determine the trustworthiness of testimonial evidence."  *Id.* at 349; *United States* v. *Ruggiero*, 824 F. Supp. 379, 396 (S.D.N.Y. 1993) (citing *Watkins* and recognizing that

district court is not required to conduct hearing on identification outside of jury's presence).

In this case, Taylor has not put forth any facts demonstrating that the circumstances of his identification were unduly suggestive, and, therefore, his motion to suppress the identification should be denied.[6]

---

[6] Moreover, Detective Slater's testimony at the Hearing indicated that the circumstances of Taylor's identification by the UC were not unduly suggestive. (*See* Tr. 18). Indeed, as Judge Marrero noted in *Alvarez* v. *Fischer*, 170 F. Supp. 2d 379 (S.D.N.Y. 2001), "in *United States* v. *Bautista*, 23 F.3d 726, 730 (2d Cir.1994), the Second Circuit recognized that a confirmatory identification by an officer witness shortly following an arrest represents an essential safeguard by police to ascertain that the proper person is apprehended. That the arrest may be accompanied by ordinary and expected arrangements such as the defendant's appearance handcuffed in the custody of police officers does not by itself subvert the identification as impermissibly suggestive." *Alvarez*, 170 F. Supp. 2d. at 385.

## **CONCLUSION**

For the foregoing reasons, Taylor's pre-trial motions should be denied in their entirety.

Dated:   New York, New York
         August 26, 2011

        Respectfully submitted,

        PREET BHARARA
        United States Attorney for the
        Southern District of New York

    By:   s/ Amy Lester
        Amy Lester
        Ryan P. Poscablo
        Assistant United States Attorneys
        (212) 637-2416/2634

**AFFIRMATION OF SERVICE**

AMY LESTER, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York. That, on August 26, 2011, I caused the Government's Memorandum of Law in Further Opposition to Defendant Javel Taylor's Pre-trial Motions to be delivered by ECF and U.S. Mail to the following:

> Joshua L. Dratel, Esq.
> 2 Wall Street, 3rd Floor
> New York, New York 10005
> JDratel@joshuadratel.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   New York, New York
         August 26, 2011

                                                /s Amy Lester
                                                Amy Lester