UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                             :

UNITED STATES OF AMERICA,      :
                             :
                             :

              *– against –*       :     11 Cr. 310 (PGG)
                             :

JAVEL TAYLOR,              :     (filed electronically)
                             :

               Defendant.    :
                             :
------------------------------------------------------x

POST-HEARING MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JAVEL
TAYLOR'S PRETRIAL MOTIONS PURSUANT TO RULE 12(b), FED.R.CRIM.P.

                                     JOSHUA L. DRATEL
                                       DRATEL & MYSLIWIEC, P.C.
                                       2 Wall Street, 3rd Floor
                                       New York, New York 10005
                                       (212) 732-0707
                                       jdratel@joshuadratel.com

                                       *Attorneys for Defendant Javel Taylor*

     *– Of Counsel –*

     Joshua L. Dratel
     Stuart A. White

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT

POINT I

THE EVIDENCE SEIZED FROM MR. TAYLOR
AT THE TIME OF HIS ARREST SHOULD BE
SUPPRESSED BECAUSE THE POLICE OFFICERS
LACKED PROBABLE CAUSE TO ARREST HIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    *The Government Failed to Establish Probable Cause Existed to Arrest Mr. Taylor* . . . . 4

    1.    *The Evidence at the Hearing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.    *The Applicable Standards for Determining Whether Probable Cause Existed* . . . 5

B.    *The Hearsay Evidence Upon Which the Government Relies Is Untrustworthy* . . . . . . . . 7

C.    *The Police Officers' Calculated Intent Was to Apprehend Mr. Taylor*
     *Regardless Whether They Possessed Probable Cause to Arrest Him* . . . . . . . . . . . . . . 11

D.    *The Contradictions and Inconsistencies In the Testimony Renders It Incredible* . . . . . . 14

POINT II

MR. TAYLOR'S ALLEGED STATEMENTS
SHOULD BE SUPPRESSED BECAUSE THEY
WERE OBTAINED IN VIOLATION OF HIS FIFTH
AND SIXTH AMENDMENT RIGHTS, AND WERE
THE PRODUCT OF HIS UNLAWFUL ARREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA,             :
                                                       :
                                                       :
            – against –                      :         11 Cr. 310 (PGG)
                                                       :
JAVEL TAYLOR,                              :
                                                       :
                      Defendant.          :
                                                       :
------------------------------------------------------x

**POST-HEARING MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JAVEL
TAYLOR'S PRETRIAL MOTIONS PURSUANT TO RULE 12(b), FED.R.CRIM.P.**

**INTRODUCTION**

This Post-Hearing Memo of Law is submitted on behalf defendant Javel Taylor in support

of his motion to suppress evidence seized from him and statements allegedly made by him

following his March 21, 2011, arrest in this case.  As detailed below, it is respectfully submitted

that evaluation of the transcript and exhibits from the July 21, 2011, evidentiary hearing

demonstrates that Mr. Taylor's motion to suppress evidence should be granted because, for the

following reasons, the New York Police Department officers who effected Mr. Taylor's arrest did

not possess probable cause to arrest him:

(1)     the hearing did not present sufficient evidence that Mr. Taylor participated in a

        drug transaction March 21, 2011 (that would have justified his arrest);

(2)     the only interaction by the officers with Mr. Taylor prior to his arrest was

        presented in wholly hearsay fashion, thereby substantially reducing its reliability;

(3)     testimony at the hearing established that purpose of the police investigation that

        day was to find and question Mr. Taylor about a separate investigation, regardless

whether any drug transaction with Mr. Taylor occurred;  and

(4)     the numerous material contradictions and inconsistencies in the testimony of the

three witnesses at the hearing renders any testimony implicating Mr. Taylor in any

narcotics transaction unworthy of belief.

Also, it is respectfully submitted that Mr. Taylor's alleged statements should be

suppressed because the hearing established that:

(a)     Mr. Taylor's alleged statements were made while he was in police custody (under

arrest), and were not preceded by the requisite warnings pursuant to *Miranda v.*

*Arizona*, 384 U.S. 436 (1966);

(b)     Mr. Taylor's alleged statements were clearly not spontaneous, but instead were

made in response to police questioning;

(c)     a witness at the hearing conceded that at least one alleged statement by Mr. Taylor

was made in response to police questioning;  and

(d)     the numerous material, irreconcilable contradictions and inconsistencies in the

testimony of the three witnesses at the hearing renders patently incredible any

claim that Mr. Taylor's statements were spontaneous.

This Post-Hearing Memo of Law will not repeat the threshold legal analysis presented in

Mr. Taylor's Initial Memo of Law, or Reply Memo of Law previously submitted in support of his

motion.  Rather, it will add legal authority and discussion only in the context of the specific facts

elicited at the hearing, and issues raised thereby.

Accordingly, it is respectfully submitted that Mr. Taylor's motion to suppress evidence

and statements be granted in its entirety.

2

## STATEMENT OF FACTS

The government presented three witnesses at the suppression hearing: (1) Detective John Paul Slater; (2) Detective Daniel Leon; and (3) Officer Melvin Mejia. All three are members of the New York City Police Department. Detective Slater was the nominal arresting officer, although, in fact, he did not arrest Mr. Taylor. Rather, Det. Leon, assisted in part by Officer Mejia, placed Mr. Taylor under arrest within the area encompassed by the Frederick Douglass Houses (hereinafter "Douglass Houses"), which is located in Manhattan between Amsterdam and Manhattan Avenues and 100th and 104th Streets. T. 6.[1]

However, Det. Slater did arrest Leonard Fitzgerald, who minutes earlier had provided an undercover police officer with crack cocaine in exchange for $40 provided by the undercover officer. T. 12-13. Mr. Fitzgerald was initially charged as Mr. Taylor's co-defendant, but has since pleaded guilty. *See* Docket Entry #8; *see also* April 27, 2011, Docket Entries.

All three witnesses testified regarding their participation in Mr. Taylor's March 21, 2011, arrest. Neither the undercover officer involved in the investigation that day, nor the "ghost" undercover officer who shadowed the principal undercover officer, testified.[2] Mr. Taylor did not call any witnesses.

The remaining facts adduced at the hearing are set forth in the context of the ensuing legal argument.

---

[1] "T." refers to the transcript of the July 21, 2011, suppression hearing.

[2] For ease of identification, the principal undercover officer will hereinafter be referred to as "UC-1," and the "ghost" undercover officer as "the Ghost."

3

**ARGUMENT**

**POINT I**

**THE EVIDENCE SEIZED FROM MR. TAYLOR
AT THE TIME OF HIS ARREST SHOULD BE
SUPPRESSED BECAUSE THE POLICE OFFICERS
LACKED PROBABLE CAUSE TO ARREST HIM**

**A.**   *The Government Failed to Establish Probable Cause Existed to Arrest Mr. Taylor*

**1.**   *The Evidence at the Hearing*

At the hearing the government failed to demonstrate that the police officers possessed

probable cause to arrest Mr. Taylor.  In fact, the hearing produced testimony and documents[3]

establishing the following conclusions:

- neither UC-1 nor any other police officer engaged in any conversation with Mr. Taylor prior to the latter's arrest, much less one that involved crack cocaine;

- neither UC-1 nor any other police officer received any crack cocaine from Mr. Taylor.  T. 23;

- UC-1's conversation with Mr. Fitzgerald did not include any explicit reference to crack cocaine.  T. 27-28;  *see also* 3501-6;

- neither UC-1 nor any other police officer observed Mr. Taylor providing any crack cocaine to Mr. Fitzgerald.  T. 23;

- neither UC-1 nor any other police officer could state definitively from whom (or where) Leonard Fitzgerald obtained crack cocaine (as none witnessed Mr.

---

[3]  These conclusions are also confirmed by the material produced by the government pursuant to 18 U.S.C. §3500 in connection with the hearing.  That material included police reports prepared by UC-1 (3501-6) and the Ghost (3501-7).

4

Fitzgerald receiving crack cocaine from anyone);

●      while Mr. Fitzgerald and Mr. Taylor entered a building in the Douglass Houses together, Mr. Fitzgerald exited the building alone, and Mr. Taylor's exit was not witnessed by any witness at the hearing. *See* 3501-6 & 3501-7;

●      neither UC-1 nor any other police officer provided Mr. Taylor any pre-recorded buy money; and

●      neither UC-1 nor any other police officer witnessed Mr. Fitzgerald transferring the pre-recorded buy money to Mr. Taylor.[4]

**2.**     ***The Applicable Standards for Determining Whether Probable Cause Existed***

As the Supreme Court has instructed, "[i]n determining whether the necessary quantum of evidence existed to support a finding of probable cause, the court is required to evaluate the totality of the circumstances." *Cohen v. Dubuc*, 2000 WL 1838351, at *4 (D. Conn. November 28, 2000), *citing Illinois v. Gates*, 462 U.S. 213, 238 (1983). Also, "[i]n making this determination, a court 'must consider those facts available to the officer at the time of arrest and immediately before it.'" *Cohen v. Dubuc*, 2000 WL 1838351, at *4, quoting *Lowth v. Town of Cheekowoga*, 82 F.3d 563, 569 (2d cir. 1996).[5]

As the Second Circuit explained in *United States v. Fisher*, 702 F.2d 372 (2d Cir. 1983), while "[t]he quantum of evidence required to establish probable cause to arrest need not reach the

---

    [4] Det. Leon, who arrested Mr. Taylor, and maintained custody of him until Det. Slater arrived at least some minutes later, did not recover any money from Mr. Taylor. T. 71.

    [5] This case does not present any issues with respect to any of the intermediate levels of police contact – *i.e.*, "stop and inquire" or "stop and frisk." *See, e.g., Terry v. Ohio*, 392 U.S. 1 (1968). Rather, here the police by their own admission proceeded immediately to an arrest without prior resort to any intervening type of police-civilian encounter.

level of evidence necessary to support a conviction, . . .[,]" it nevertheless "must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'"  *Id*., at 375, *quoting Henry v. United States*, 361 U.S. 98, 101-02 (1959) (other citations omitted);  *see also Brinegar v. United States*, 338 U.S. 160, 170 (1949);  *Flores v. City of Mount Vernon*, 41 F. Supp.2d 439, 443 (S.D.N.Y. 1999);  *Wu v. City of New York*, 934 F. Supp. 581, 588 (S.D.N.Y. 1996).  As the Court in *Flores* noted, "[i]n our country, arrests cannot be based on mere suspicion."  41 F. Supp.2d at 443 (citations omitted).

    In *Fisher*, the Circuit also pointed out that in *Wong Sun v. United States*, 371 U.S. 471, 481 (1963),

> information that narcotics had been sold by a person known as "Blackie" Toy, proprietor of a laundry on Leavenworth Street, did not constitute probable cause to arrest James Wah Toy, a laundry proprietor on that street, since there were several laundries on Leavenworth Street, several persons named Toy, and no indication in the record that the agents had "information of some kind which had narrowed the scope of their search to this particular Toy."

702 F.2d at 375..

    Similarly, in *Flores* among the factors contributing to the Court's finding that probable cause did not exist was that "[t]he police did not know who had gone with "Shawn" into the back of the premises to obtain the cocaine during the controlled buy."  41 F. Supp.2d at 443 (citation omitted).  Also, in *Henry v. United States*, 361 U.S. 98 (1959), the Court recounted that in *Johnson v. United States*, 333 U.S. 10, 13-15 (1948), "the smell of opium coming from a closed room was not enough to support an arrest and search without a warrant."  361 U.S. at 101.

    Here, these principles and examples establish that the police officers did not possess probable cause to arrest Mr. Taylor.  As set forth above, the officers did not observe a drug

transaction, and did not observe money changing hands.  Armed with suspicion only – even a strong reason to suspect – with respect to Mr. Taylor, the police lacked probable cause to arrest him.

**B.**      *The Hearsay Evidence Upon Which the Government Relies Is Untrustworthy*

In addition, because the government chose not to call UC-1 or the Ghost as witnesses, much of the most important testimony presented by the government – relating to the interaction between UC-1 and Mr. Fitzgerald, and Mr. Fitzgerald and Mr. Taylor – was in the form of hearsay.  Nor does Det. Slater's claim that the police had "intelligence" that Mr. Taylor "sold crack inside the Frederick Douglass Houses" suffice to establish probable cause, T. 45, or buttress Det. Slater's conclusory assertion that UC-1's asking Mr. Fitzgerald for "Jay" signified "[t]hat the undercover is looking to buy crack cocaine."  T. 46.  *See also* **post**, at n. 11.  Indeed, there is nothing in the record to support those contentions.

While hearsay has been permitted in the context of pretrial hearings (for purposes of both the Federal Rules of Evidence and the Sixth Amendment's Confrontation Clause),[6] the

---

[6]  At the hearing, the Court overruled a defense objection to hearsay.  T. 14.  Interestingly, there exists a dichotomy in the Sixth Amendment analysis with respect to pretrial proceedings. For example, two Circuits have held explicitly that a pretrial suppression hearing constitutes a "'critical stage' of the prosecution, requiring the presence of counsel for the accused."  *United States v. Hamilton*, 391 F.3d 1066, 1070 (9th Cir. 2004).  *See also Olney v. United States*, 433 F.2d 161, 163 (9th Cir. 1970);  *United States v. Green*, 670 F.2d 1148, 1154 (D.C. Cir. 1981).

However, in the context of the Confrontation Clause, the Sixth Amendment has *not* been held applicable in pretrial (or post-trial) proceedings.  Also, although the Court in *United States v. Wade*, expressly applied the *critical stage* approach only to the right to counsel, its holding has been interpreted as providing defendants with the right to "meaningfully [] cross-examine the witnesses."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 69 (1987) (Blackmun, J., *concurring*) ("[*Wade*'s] holding was premised explicitly on concern for infringement of Confrontation Clause rights").

underlying deficiencies in hearsay testimony do not disappear simply because it is admissible.[7] Indeed, those defects – the historical basis for hearsay rules in the first place – simply illuminate the tenuous and inadequate nature of the testimony at the hearing.

Indeed, just because hearsay is admissible in a particular proceeding does not mean the dangers presented by hearsay are somehow removed, or that courts should treat such evidence as it would that which would be competent under the Federal Rules of Evidence and/or the Sixth Amendment. *See United States v. Vance*, 294 Fed.Appx. 3 (4th Cir. 2008) (hearsay evidence "must be 'demonstrably reliable' to be admissible." in Violation of Supervised Release proceedings), *citing United States v. McCallum*, 677 F.2d 1024, 1026 (4th Cir. 1982) As a result, it is respectfully submitted that the government's extensive reliance on hearsay warrants special scrutiny for purposes of determining whether it has established probable cause for Mr. Taylor's arrest.

---

[7] While the hearsay rules and the Confrontation Clause overlap to some extent, and while prior to *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court described the central concern of the Confrontation Clause as "ensur[ing] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing. . . [,]" *Maryland v. Craig*, 497 U.S. 836, 845 (1990), *Crawford* identified important distinctions:

> a remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, ex parte examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

541 U.S. at 51. Thus, admissibility under the Confrontation Clause is not at all synonymous with reliability.

As Chief Justice John Marshall stated nearly two centuries ago in identifying the problems inherent in hearsay, "[t]hat this species of testimony supposes some better testimony which might be adduced in the particular case, is not the sole ground of its exclusion." *Mima Queen and Child v. Hepburn*, 11 U.S. 290, 295-96, 7 Cranch 290, 295-96 (1813).

Rather, as Justice Marshall declared in *Queen* (while acknowledging certain limited exceptions) hearsay suffered from fundamental flaws:  "Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is totally inadmissible." *Id.*, at 296.[8]

More recently, in *Schering Corporation v. Pfizer Inc., et al.*, 189 F.3d 218 (2d Cir. 1999), the Second Circuit had occasion to address the dangers of hearsay in the context of Rule 807, Fed.R.Evid., the "residual exception" that focuses on "circumstantial guarantees of trustworthiness[.]" As the Court in *Schering* explained,

> [t]he hearsay rule is generally said to exclude out-of-court statements offered for the truth of the matter asserted because there are four classes of risk peculiar to this kind of evidence: those of (1)  insincerity, (2)  faulty perception, (3)  faulty memory and (4) faulty narration, each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered.

*Id.*, at 232, *citing Headley v. Tilghman,* 53 F.3d 472, 477 (2d Cir.1995) (referring to classic hearsay "risks of insincerity, distorted perception, imperfect memory, and ambiguity of utterance");  Edmund M. Morgan, *Hearsay Dangers and Application of the Hearsay Concept,* 62

---

[8]  Justice Marshall warned in *Queen* that, "[i]f the circumstance that the eye witnesses of any fact be dead should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property, a claim to which might be supported by proof so easily obtained." *Id.*, at 296.

Harv. L.Rev. 177, 185 (1948) (identifying these classic hearsay risks).

As a result, the Court in *Schering* continued,

> [t]he hearsay rule ordinarily prohibits the admission of out-of-court
> statements by declarants on the theory that cross-examination can
> help test for these four classes of error, thus allowing the
> fact-finder to weigh the evidence properly and to discount any that
> is too unreliable.

189 F.3d at 232-33, *citing* Note, *Public Opinion Surveys as Evidence: The Pollsters Go to Court,*
66 Harv. L.Rev. 498, 501 (1953) ( "[c]ross-examination serves to test the declarant's sincerity,
narrative ability, perception, and memory . . . .").

In *Schering*, in determining admissibility under Rule 807, the Court pointed out that "[i]t
is thus important to recognize that the trustworthiness of these exceptions is a function of their
ability to minimize some of the four classic hearsay dangers." 189 F.3d at 233, *citing* Laurence
H. Tribe, *Triangulating Hearsay,* 87 Harv. L.Rev. 957, 961 (1974) ("[t]he traditional hearsay
exceptions can usefully be clustered into . . . groups, based on the different ways in which the
members of each group overcome the [four] potential infirmities [generally associated with
hearsay]").

As a result, the Court in *Schering* instructed that

> Courts deciding whether evidence is sufficiently trustworthy to be
> admitted under the residual hearsay rule should therefore be aware
> of these facts and of the relative degree to which the evidence
> offered is prone to risks like those under discussion.

189 F.3d at 233.

Here, all four dangers of hearsay are present without amelioration, and correspondingly reduce the reliability of the government's presentation at the hearing.[9]  As a result, the hearsay character of the government's presentation is a compelling factor supporting the conclusion that the government has failed to meet its burden of establishing probable cause to arrest Mr. Taylor.

**C.**     ***The Police Officers' Calculated Intent Was to Apprehend Mr. Taylor Regardless Whether They Possessed Probable Cause to Arrest Him***

In addition, the hearing produced the following additional conclusions relevant to whether the officers possessed probable cause to arrest Mr. Taylor:

- from the outset – before UC-1 even approached Mr. Fitzgerald on 103rd Street and Broadway, a full long city block from the Douglass Houses, T. 48, the objective of the police investigation March 21, 2011, was to find Mr. Taylor and question him about a shooting that had occurred;  T. 26, 45, 48;[10]

- Det. Slater already knew Mr. Taylor prior to any police investigation or activity March 21, 2011.  T. 10, 26, 32;

- UC-1 asked Mr. Fitzgerald for "Jay" in a specific, calculated effort to locate Mr.

_____

[9]  In *Schering*, which involved public survey information, the Court noted that "[p]roper survey methodology can also help reduce two of the four classic hearsay dangers.  In particular, the risk of insincerity can ordinarily be reduced if the interviewers and those questioned lack knowledge of the litigation and the purpose of the survey."  *Id.*, at 233.  Here, of course, Det. Slater had comprehensive knowledge of the litigation and the purpose(s) of his testimony, thereby exacerbating substantially the "insincerity" danger inherent in hearsay.

[10]  Also, Det. Leon did not make any effort to learn the identity of a bystander who assisted him in arresting Mr. Taylor, even though Mr. Taylor was initially charged in New York State court with, *inter alia*, resisting arrest (and Det. Leon agreed that such a person would be a "pretty important witness for resisting arrest").  T. 62-63.

Taylor.  T. 26; 3501-6;[11]

- the investigative objective was so focused on Mr. Taylor, and not on drug activity, that Det. Leon[12] and Officer Mejia concentrated on apprehending him at the expense of permitting an unidentified person (wearing a gray hooded sweatshirt) to avoid apprehension *even though that person was suspected to be in possession of an amount of crack cocaine significantly in excess of that Mr. Fitzgerald provided to UC-1*.  T. 64-65, 89-92;[13]

- the police did not find any drugs on Mr. Taylor when he was arrested.  T. 63;  and

- after Mr. Taylor's arrest and transfer to the precinct stationhouse, he was not questioned about any drug sales or activity, but rather about the prior shooting.  T. 26.

The police's ulterior motive does not affect the validity of Mr. Taylor's arrest *if* there existed independent probable cause to arrest him for an articulable offense.  *See Whren v. United*

---

[11]  In his police report (3501-6), UC-1 wrote that

[a]s I walked on 103 St [near Broadway] I made eye contact with [Mr. Fitzgerald] and asked him if he knows Jay from the projects located on Amsterdam Avenue.

3501-6.

[12]  Det. Leon, when asked, "And you also attempted to detain the other person, right?" answered, "I went directly to Mr. Taylor, Mr. Taylor only."  T. 65.

[13]  That tactic simply defied ordinary practice with respect to drug investigations and arrests, namely to find the "stash" and seize it (and arrest whoever possesses it).  T. 32, 90-91. Also, despite the imminent availability of other officers, Det. Leon and Officer Mejia decided to effect an arrest by themselves even though there were allegedly two suspects.  T. 65-66.  When asked, "If you were looking to arrest two people, do you think two officers is sufficient, on the street?" Det. Leon replied, "Sometimes it is, sometimes it's not."  T. 66.

*States*, 517 U.S. 806, 811 (1996) ("ulterior motives" do not "invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred").  *See also United States v. Scopo*, 19 F.3d 777, 781-82 (2d Cir. 1994) (pretextual traffic stop was nonetheless valid because it was "based upon a specific and articulable fact:  the observed traffic violation");  *United States v. Dhinsa*, 171 F.3d 777,  (2d Cir. 1999) (same).

However, the pretext in this case – finding Mr. Taylor for the purpose of questioning him about the shooting that was under investigation – informs the probable cause analysis in three critical respects:  (1) it provides a reason why the "buy and bust" operation was performed in a manner that was not concerned principally with confirming definitively that Mr. Taylor was the seller (but instead with simply finding Mr. Taylor);  (2) it establishes a reason why the police would apprehend Mr. Taylor regardless whether there existed probable cause to arrest him for a drug offense;  and (32) it impeaches the credibility of the police witnesses with respect to their description of the events as they relate to the existence of such probable cause.

In that context, the police's underlying motive for making contact specifically with Mr. Taylor reinforces the conclusion that probable cause for arrest did not exist.[14]

_____

[14]  Indeed, the particular facts of this case implicate Judge Newman's admonition in his concurring opinion in *Scopo*, in which he cautioned that

> the risk inherent in such a practice [permitting pretext stops and/or searches based on probable cause for *some* observable offense] is that some police officers will use the pretext of traffic violations or other minor infractions to harass members of groups identified by factors that are totally impermissible as a basis for law enforcement activity – factors such as race or ethic origin, or simply appearances that some police officers do not like, such as young men with long hair, heavy jewelry, and flashy clothing.

19 F.3d at 785-86 (Newman, J., *concurring*).  Here, though, the issue need not be reached

**D.**    ***The Contradictions and Inconsistencies In the Testimony Renders It Incredible***

The testimony at the hearing also is unworthy of belief because of the inconsistencies, contradictions, and dubious claims made therein.  The following constitute only the most glaring and material examples:

- Det. Slater's failure to utilize the recording function on the Kell radio transmitter to preserve UC-1's contacts with Mr. Fitzgerald and/or Mr. Taylor.  T. 21-22;[15]

- the officers did not recover a cell phone from Mr. Taylor, T. 32, 56, 63, 69, or even the surrounding area despite a concerted canvass.  T. 56, 69, 96-97.[16]  Nor did Det. Leon see Mr. Taylor throw anything once approached by police.  T. 68;[17]

- Det. Slater claimed to have found in Mr. Fitzgerald's possession a piece of paper with the notation "Jay" and a phone number (the same number that Mr. Fitzgerald had called from UC-1's cell phone, ostensibly to summon "Jay"), T. 13-14, while neither UC-1 nor the Ghost reported that Mr. Fitzgerald needed to consult any

---

because the police lacked probable cause for even the limited, pretextual offense for which Mr. Taylor was arrested.

[15] Det. Slater's excuses why he did not record via the Kell represent pure evasion.  T. 21-22, 28-29.

[16] In *Henry v. United States*, the Court cautioned that "[a]n arrest is not justified by what the subsequent search discloses."  361 U.S. at 104.  Here, the lack of any cell phone is not noted because its recovery could have justified the search, but because the failure to find any cell phone casts substantial doubt upon the police witnesses' version of events.

[17] Nor did Mr. Taylor react with any suspicion until Det. Leon announced himself to arrest Mr. Taylor.  T. 68.

paper before dialing UC-1's phone.  T. 27;  *see also* 3501-7; 3501-6;[18]

- while Officer Mejia claimed he observed Mr. Taylor passing "a clear, tennis ball size . . . wrapped up like Saran wrap but it was clear and appeared to be like multiple dark-colored zips inside[,]" T. 79, Officer Mejia did not treat that suspect as a priority, but instead first sought to assist Det. Leon in arresting Mr. Taylor. T. 83-84, 90-92;[19] and

- while Officer Mejia also belatedly (during redirect) claimed that he saw Mr. Taylor place a cell phone on the fence when he was arrested, T. 101, he conceded that he knew there had been a search for the phone, T. 103, and the contention regarding the fence does not appear in his post-arrest report, T. 98-99, 103, *see also* 3503-2, and was not in the prosecutor's notes of the interview of Officer Mejia.  T. 97-99;  *see also* 3503-3.  Moreover, Det. Leon, who arrested Mr. Taylor and pressed him against the fence, T. 92, *see also* 3503-3, did not see any such phone.  T. 57.

Each and all of these illustrations simply support the conclusion that the government failed to establish that probable cause existed to arrest Mr. Taylor. [20]

---

[18]  The government did not introduce any evidence regarding UC-1's phone records, or any other records related to any cell phone activity.

[19]  Nor did any of the officers issue a bulletin or other description of that suspect for purposes of future apprehension.  T. 96.  Officer Mejia claimed he that at some point he did return to the Douglass Houses to look for him, albeit without success.  *Id*.

[20]  In *Colon v. City of New York*, 09 Civ. 008 (E.D.N.Y.) (JBW)(CLP), Document #34, November 30, 2009, Judge Weinstein, in ordering discovery, noted that "[i]nformal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting

**POINT II**

**MR. TAYLOR'S ALLEGED STATEMENTS
SHOULD BE SUPPRESSED BECAUSE THEY
WERE OBTAINED IN VIOLATION OF HIS FIFTH
AND SIXTH AMENDMENT RIGHTS, AND WERE
THE PRODUCT OF HIS UNLAWFUL ARREST**

In its earlier papers, and through Det. Slater's testimony at the hearing, the government has advanced the position that Mr. Taylor's alleged statements are admissible because they were spontaneous, and not uttered in response to any police questioning.  However, for the reasons set forth below, the record refutes that contention.

As a threshold matter, it cannot be disputed that Mr. Taylor was already in Det. Leon's custody – on the ground and handcuffed – when Det. Slater arrived at the scene of Mr. Taylor's arrest.  T. 15, 41.  Also, Det. Slater confirmed that neither he nor any officer informed Mr. Taylor of his *Miranda* rights.  T. 44.

The sole description of Mr. Taylor's statements occurred during Det. Slater's testimony:

Q.      What was Detective Leon doing?

A.      He was standing above him.

Q.      As you approached, did the defendant do anything?

A.      Yes.

Q.      What did he do?

A.      He was talking.

Q.      What was he saying?

A.      He was saying he ran because he had bud and that he threw it.

---

police officers of the New York City Police Department."  *Id.*, at 3.

16

*       *       *

Q.     Did he say anything else?

A.     Yes.

Q.     What did he say?

A.     I picked up the jacket that he was wearing that was now next to him and I began just to search it.  I pulled out money from the inside jacket pocket and he said to me:  "That's not marked money, my sister gave that to me."

T. 16.

An additional statement related by Det. Slater, was – even according to Det. Slater's testimony – in response to police questioning:

Q.     And you say [Mr. Taylor] said there wasn't marked money.  Was he privy to your plan for the transaction that you would use marked money?

A.     I asked him after the fact.  I said, "Do you know about this?"  And he said, "Yes. I've been through this before."

T. 43.

Examination of that testimony, as well as of Det. Leon's testimony (discussed below), compels the conclusion that *all* of Mr. Taylor's statements were made in response to police questioning.  Indeed, in light of the chronology of events and syntax of the statements, that is the only scenario that conforms with common sense and practice.  *See United States v. DeGounette*, 2007 WL 607234, at *3 (W.D.N.Y. Feb. 22, 2007) (answer in response to law enforcement officer' question was not "spontaneous").

In addition to the list provided **ante**, at 13-15, regarding the contradictory and incredible nature of the testimony at the hearing, the following points, related specifically to the statements issue, establish that any statements by Mr. Taylor were not "spontaneous," but instead constituted

17

replies to police questioning:

- the time that elapsed between Det. Slater arresting Mr. Fitzgerald on 104th Street between Amsterdam and Columbus Avenues, and his arrival at the scene of Mr. Taylor's arrest (at which point Mr. Taylor allegedly first made spontaneous statements).  T. 36-40;[21]

- Det. Leon did not report any statements by Mr. Taylor.  Nor did any other officers. T. 42-43;  *see also* 3503-2;

- Det. Slater claimed he picked up Mr. Taylor's jacket, but Det. Leon did not testify to, or have any recollection of, removing Mr. Taylor's jacket.  T. 16, 56, 67.  Det. Leon testified that Mr. Taylor had his jacket on when he was arrested.  T. 67. Also, since Mr. Taylor was handcuffed almost immediately upon being subdued by Det. Leon, it was not explained how his jacket was thereafter removed;

- no explanation why Det. Slater would search the jacket after arriving so much later after Mr. Taylor's (and why that search was not performed by the other officers who arrived on the scene earlier, including Det. Leon);

- Det. Leon claimed he could not recall whether he searched Mr. Taylor's jacket, or even whether he searched him at all – even though he was alone with Mr. Taylor for a period after effecting the arrest before other officers arrived, and that a security search of Mr. Taylor would be routine under such circumstances.  T. 63, 67.

---

[21]  Det. Slater testified that he traveled by car from 104th Street southbound on Columbus Avenue, then westbound on 97th Street, then northbound on Amsterdam Avenue to 102nd Street, and then into the Douglass Houses, all during rush hour on a weekday.  T. 13, 15, 37-39.

- since Det. Slater was not present when Mr. Taylor was arrested by Det. Leon, there was not any reason for Mr. Taylor spontaneously to tell Det. Slater why he (Mr. Taylor) had "run."  T. 43, 55-56;

- Det. Slater first admitted that he knew Mr. Taylor before March 21, 2011, and that he was interested in Mr. Taylor because of the prior shooting.  He also contended he did not write down in his memo book a physical description of Mr. Taylor because "I saw him with my own eyes."  T. 25.  He also had been informed via radio that Mr. Taylor had been arrested, and returned to the Douglass Houses for that reason.  T. 15, 40-41. Yet he claimed that when he came upon Mr. Taylor on the ground, handcuffed and in custody, he did not know it was Mr. Taylor.  T. 43;

- Mr. Taylor was not informed of the basis for his arrest (the alleged transaction with Mr. Fitzgerald), and therefore would not have had any idea that Det. Slater was looking for pre-recorded buy money.  T. 44.[22]  As a result, there would not have any reason for him to make that statement spontaneously.  Conversely, it would have been a natural response to a question from Det. Slater about the pre-recorded buy money;

---

[22] For example, Det. Slater testified as follows:

Q.    Nobody made [Mr. Taylor] aware that anything he did with Mr. Fitzgerald was the reason for his arrest, right?

A.    Correct.

T. 44.

19

Accordingly, Mr. Taylor's alleged statements should be suppressed because they were obtained in violation of his Fifth and Sixth Amendment rights, and/or because they were the product of his unlawful arrest.

### Conclusion

Accordingly, for all the reasons set forth above, it is respectfully submitted that the Court should (1)  suppress all materials (and fruits thereof) seized from Mr. Taylor incident to his arrest;  and (2)  suppress any and all statements (and fruits thereof) attributed to Mr. Taylor.

Dated: August 26, 2011
       New York, New York

                              Respectfully submitted,

                               /s/Joshua L. Dratel
                              Joshua L. Dratel
                              DRATEL & MYSLIWIEC, P.C.
                              2 Wall Street, 3rd Floor
                              New York, New York 10005
                              (212) 732-0707
                              jdratel@joshuadratel.com

                              *Attorneys for Defendant Javel Taylor*

   – Of Counsel –

Joshua L. Dratel
Stuart A. White

20