UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JAVEL TAYLOR,

Defendant.

**MEMORANDUM OPINION
& ORDER**

11 Cr. 310 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Javel Taylor is charged with conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846, and with distributing and possessing with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C).

Taylor has moved to suppress (1) physical evidence seized at the time of his arrest, claiming that the arrest was not supported by probable cause; and (2) his post-arrest statements, on the grounds that the statements were the product of his unlawful arrest and were elicited in violation of Miranda v. Arizona, 384 U.S. 436 (1966).[1]  (Dkt. No. 9)

For the reasons set forth below, Taylor's motion to suppress will be granted in part and denied in part.

**BACKGROUND**

I.      **TAYLOR'S DECLARATION**

In support of his motion to suppress, Taylor submitted a declaration setting forth the following version of events:  On March 21, 2011, he entered an apartment building located at

---

[1]  Taylor had also moved to suppress a police identification, but subsequently withdrew this claim.  (Transcript of September 16, 2011 conference at 2; September 14, 2011 Dratel Ltr.)

860 Columbus Avenue to pick up his eight-year-old niece.  (Dratel Decl., Ex. 1 (Taylor Decl.) at ¶ 5)  He met his niece in the building's lobby.  While in the lobby, Taylor saw a man step out of an elevator carrying a pair of Panasonic speakers.  (Id. ¶ 6)  Taylor expressed interest in the speakers, and the man offered to sell them to Taylor for $25.  (Id.)  Taylor's niece ran outside to play in the park, and Taylor then tested the speakers, using an iPod.  (Id. ¶¶ 7-8)  Taylor was happy with the speakers, and purchased them with a $100 bill, receiving $75 in change:  two $20 bills, three $10 bills, and five $1 bills.  (Id. ¶ 9)  Taylor then left the building to find his niece in the park.  (Id.)

While walking towards the park, Taylor was grabbed from behind by a police officer in plain clothes, and the speakers fell to the ground.  (Id. ¶¶ 9-10)  Four other officers then arrived.  One officer said, "You knew we were cops.  Why did you try to run?"  (Id. ¶ 11)  After Taylor answered,[2] the officer asked, "Where's the weed?"  (Id.)  "None of the officers read [Taylor] any rights, or informed [him] why [he] had been arrested."  (Id.)  The officers also searched Taylor, recovering – inter alia – U.S. currency.  (Id. ¶ 12)

## II.    SUPPRESSION HEARING TESTIMONY

Detective John Paul Slater, Detective Daniel Leon, and Police Officer Melvin Mejia – New York City police officers involved with Taylor's arrest – testified at a July 21, 2011 suppression hearing.  Taylor did not testify at the hearing.

According to the police officers' testimony, on March 21, 2011, Detective Slater and other members of his field team, including Detective Leon, Officer Mejia, and two undercover officers, conducted a "buy and bust" operation in the vicinity of the Frederick Douglass Houses on the Upper West Side of Manhattan, which resulted in the arrests of Taylor

---

[2]  Taylor does not state what his answer was to this question.  (Taylor Decl., ¶ 11)

and his co-defendant, Leonard Fitzgerald.[3]  (Transcript of July 21, 2011 Suppression Hearing ("Tr.") at 5, 51, 75)

Before leaving for the Douglass Houses, Detective Slater gave pre-recorded buy money to the primary undercover officer (the "UC") to purchase crack cocaine during the operation.[4]  (Tr. 5, 6)  The field team drove to the Douglass Houses in unmarked vehicles. Detective Slater parked near the intersection of 101st Street and Amsterdam Avenue on the west side of the Douglass Houses (Tr. 6-8), while Officer Leon and Detective Mejia parked on the opposite side of the Douglass Houses, on Columbus Avenue in the vicinity of 103rd or 104th Street.  (Tr. 53, 77)

Detective Slater then received a radio communication from a "ghost" – another undercover officer who was responsible for ensuring the safety of the UC by transmitting information to the field team about the UC's location and the individuals with whom the UC interacted.  (Tr. 9-10)  Detective Slater drove his car north on Amsterdam Avenue towards 103rd Street, where he observed the UC speaking with a man later identified as Fitzgerald.  (Tr. 9-10) The UC asked Fitzgerald for "Jay,"[5] and Fitzgerald "asked for the money."  (Tr. 28)  Fitzgerald then used the UC's cell phone to call "Jay."  (Tr. 26-27)

At this point, Detective Slater observed a man later identified as Taylor[6] cross from the east side of Amsterdam Avenue to the west side of that street, and approach Fitzgerald on the northwest corner of 103rd Street and Amsterdam.  (Tr. 11)  Taylor was wearing a red

---

[3]  Fitzgerald pleaded guilty to the same two counts Taylor is charged with on April 27, 2011.
[4]  "Pre-recorded buy money" is currency that an officer has photocopied, thus preserving a record of each bill's serial number.  (Tr. 5)
[5]  Detective Slater testified that Taylor is known by the nickname "Jay."  (Tr. 46, 47)
[6]  Detective Slater testified that Taylor "was wanted in regards to a shooting, a homicide."  (Tr. 45)  Although Slater knew that Taylor was known to sell crack inside the Douglass Houses, he was not aware – until after Taylor identified himself post-arrest – that the second man police arrested was in fact Taylor.  (Tr. 45-47)

hooded sweatshirt, a black leather jacket with an embroidered design on the back, black cargo pants, and black boots. (Tr. 10-11, 20) Taylor and Fitzgerald walked east towards the Douglass Houses, with the UC following. (Tr. 11) At that point, Detective Slater radioed the field team that two suspects were walking back to the Douglass Houses, providing descriptions of the two men. (Tr. 12) The UC communicated to Detective Slater that he had given the pre-recorded buy money to Fitzgerald, and also told Slater when Fitzgerald and Taylor entered one of the Douglass Houses buildings. (Tr. 12) None of the officers could see Fitzgerald or Taylor once they entered the building. (Tr. 23) When the UC saw Fitzgerald leave the building alone, he relayed this information to Detective Slater. (Tr. 12)

Approximately a minute later, the UC radioed Detective Slater to confirm that he had obtained crack cocaine from Fitzgerald. (Tr. 12) The UC also told the detective that Fitzgerald was then on the north side of 104th Street between Amsterdam and Columbus Avenues. (Tr. 12-13) Detective Slater drove to that location and arrested Fitzgerald.[7] (Tr. 13, 37) After Fitzgerald's arrest, the ghost radioed Detective Slater to report that Taylor had come out of one of the Douglass Houses buildings. Detective Slater proceeded to 102nd Street and Amsterdam Avenue to assist Officer Leon and Detective Mejia in arresting Taylor. (Tr. 14-15, 38)

Once Detective Leon and Officer Mejia heard on the radio that the UC had purchased crack cocaine and heard the physical description of the two men involved in the

---

[7] Fitzgerald had a note in his pocket bearing the name "Jay" and a telephone number. (Tr. 13-14) The UC confirmed to Detective Slater that Fitzgerald had dialed that number on the UC's cell phone just before the drug transaction took place. (Tr. 14)

transaction, they left their vehicle and entered the Douglass Houses complex.[8]  (Tr. 52, 54, 77-79)  Officer Mejia then saw a man matching the description of one of the crack dealers – Taylor – and another man exiting 860 Columbus Avenue,[9] a building located just north of 102nd Street between Amsterdam and Columbus Avenues.  (Tr. 79-80, 86, 100)  Taylor was talking on a cell phone.  (Tr. 80)  Officer Mejia followed the two men, and saw Taylor hand a package of what appeared to be crack cocaine packaged inside dark-colored ziplock bags – wrapped in Saran Wrap – to his companion, who placed the package in his sock.  (Tr. 79, 81-82)  Taylor and the other man then walked to the south side of the building, where Officer Mejia walked past them. (Tr. 83)

Detective Leon was walking behind Officer Mejia and then encountered Taylor, who matched the physical description he had heard on the radio of one of the crack dealers.  (Tr. 54, 55, 83)  Detective Leon approached Taylor and the other individual, and Officer Mejia walked back to assist Detective Leon in making arrests.  As Officer Mejia was attempting to put handcuffs on Taylor, he instructed Taylor's companion to "come over."  The second man ran away, however, and Officer Mejia then let go of Taylor and gave chase.  The man ran into Central Park and escaped.  (Tr. 55, 83-84, 96)  Taylor attempted to escape as well, but, after a struggle – in which both Detective Leon and Taylor wound up on the ground – Detective Leon succeeded in handcuffing Taylor and placed him under arrest.  (Tr. 56-57)  No cell phone was recovered from Taylor at the time of his arrest, and a search of the area likewise did not yield a cell phone.  (Tr. 32, 57, 63, 68-69, 96-97)

---

[8]  Detective Leon walked south on Columbus Avenue towards 102nd Street, where he made a right turn into the Douglass Houses.  (Tr. 54)  Officer Mejia entered the Douglass Houses complex at the 103rd Street walkway.  (Tr. 78-79)

[9]  Detective Mejia initially identified the building as 860 Amsterdam Avenue, but clarified during cross-examination that the correct address was 860 Columbus Avenue.  (Tr. 79, 84, 86)

When Detective Slater arrived at the scene of Taylor's arrest, he observed Taylor in handcuffs on the ground with Detective Leon standing above him.  (Tr. 15-16)  As Detective Slater approached, Taylor "was talking," stating that "he ran because he had bud" – which Detective Slater understood to mean marijuana – "and that he threw it [away]."  (Tr. 16) Detective Slater then searched Taylor's jacket and found $45 in United States currency, including the $40 of pre-recorded buy money that the UC had given to Fitzgerald for the crack cocaine.[10]  (Tr. 16, 17, 32)  When Detective Slater removed the money, Taylor said, "[t]hat's not marked money, my sister gave that to me."  (Tr. 16)  Detective Slater testified that both of Taylor's statements were spontaneous and were not made in response to any questions asked by himself or other law enforcement officers.  (Tr. 17, 43)  After Taylor's statement about the money in his jacket, Detective Slater asked if he knew that police used marked money.  Taylor replied, "yes, I've been through this before."[11]  (Tr. 43)

After Fitzgerald and Taylor were arrested, the UC confirmed that the field team had placed the correct men under arrest.  (Tr. 17-18)  Detective Slater also recognized Taylor as the individual he had seen crossing Amsterdam Avenue to meet with Fitzgerald on the corner of 103rd Street.  (Tr. 18)

## DISCUSSION

## I.  TAYLOR'S ARREST WAS SUPPORTED BY PROBABLE CAUSE

Taylor has moved to suppress evidence seized at the time of his arrest, claiming that the police lacked probable cause to arrest him.  This Court concludes that Taylor's arrest

---

[10]  No drugs were recovered from Taylor, nor was any marijuana found in the area.  (Tr. 63, 70-71)

[11]  The Government does not seek to introduce this statement.  (Transcript of September 16, 2011 conference at 3)

was supported by probable cause.  Accordingly, his motion to suppress evidence seized at the time of his arrest will be denied.

A. **Legal Standard**

The Fourth Amendment requires that an arrest be supported by probable cause. See, e.g., United States v. Valentine, 539 F.3d 88, 93 (2d Cir. 2008).  "[P]robable cause is 'a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules.'"  United States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  "'Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'"  Valentine, 539 F.3d at 93 (quoting United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990) (citing Brinegar v. United States, 338 U.S. 160, 175-76 (1949))).  "When making a probable cause determination, '[t]he experience of a [law enforcement] officer is a factor to be considered.'"  Arias v. United States, Nos. 09 Cv 4536(CM), 07 Cr. 813(CM), 2011 WL 1332190, at *8 (S.D.N.Y. Mar. 31, 2011) (quoting United States v. Fisher, 702 F.2d 372, 378 (2d Cir. 1983)).

Probable cause "requires neither a prima facie showing of criminal activity nor a showing that evidence of crime will more likely than not be found.  Rather, it requires only the possibility of criminal activity or the possibility that evidence of a crime will be found."  United States v. Rodriguez, No. S107 Cr. 699(HB), 2008 WL 52917, at *5 (S.D.N.Y. Jan. 2, 2008).  "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, but it must be more than rumor, suspicion, or even

a 'strong reason to suspect.'" Fisher, 702 F.2d at 375 (quoting Henry v. United States, 361 U.S. 98, 101 (1959)) (citations omitted). Moreover, "a showing of probable cause cannot be negated simply by demonstrating that an inference of innocence might also have been drawn from the facts alleged." Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007); see also United States v. Delossantos, 536 F.3d 155, 161 (2d Cir. 2008) ("The fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause." (citation omitted)).

**B.** **Analysis**

    Here, the evidence adduced at the hearing establishes probable cause for Taylor's arrest.[12] The UC asked Fitzgerald for "Jay," an alias Taylor uses. (Tr. 27-28, 46-47) After Fitzgerald called "Jay" and obtained the purchase price from the UC, officers observed Taylor – wearing highly distinctive clothing – crossing to the west side of Amsterdam Avenue at 103rd Street to meet Fitzgerald. The two men then walked to the Douglass Houses, entering a building together.[13] (Tr. 11-12) Fitzgerald then came out alone and delivered the crack cocaine to the

---

[12] While this Court has considered both Taylor's declaration and the officers' testimony on the issue of probable cause, the latter is entitled to more weight, because it was subject to cross-examination and is found by this Court to be credible. See, e.g., United States v. Fuentes, No. 07 Cr. 329(SHS), 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement regarding whether he gave consent); United States v. Robles, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (noting that courts "'give greater weight to [witness] testimony, which was subject to cross examination, than to affidavits'" (quoting United States v. Gardner, 611 F.2d 770, 774 n. 2 (9th Cir. 1980), and citing United States v. Frank, 8 F.Supp.2d 284, 291 n. 2 (S.D.N.Y. 1998) (crediting witness testimony over affidavit because the affidavit was not subject to cross-examination and the testifying witnesses were credible)); United States v. Long Huang You, 198 F. Supp. 2d 393, 401 n.8 (S.D.N.Y. 2002 ) (same); United States v. Juliano, No. 99 Cr. 1197(AGS), 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and truthful").

[13] The parties dispute whether Taylor entered the building with Fitzgerald, but the testimony of the police officers on this point is consistent and credible. Taylor's account in his declaration is, in contrast, not credible. He states that he entered the building alone; serendipitously saw a

UC.  (Tr. 12)  When arrested, Fitzgerald was found to have a slip of paper bearing the name

"Jay" and a telephone number he had called immediately before providing the crack to the UC.

(Tr. 13-14)  Taylor – whose description and distinctive clothing had been communicated to the

field team (Tr. 10-11) – was then observed leaving the building.  Officer Mejia observed Taylor

pass what appeared to be a package of crack cocaine to an unidentified man, who secreted the

package in his sock.[14]  When Officer Mejia approached to arrest Taylor, he instructed the second

man to "come over."  Instead, the man fled into Central Park.  The totality of the circumstances

is sufficient to "justify a person of reasonable caution in believing that an offense has been . . .

committed [and that Taylor committed it]."  Valentine, 539 F.3d at 93.

            Because the police had probable cause to arrest Taylor, his motion to suppress the

evidence seized at the time of his arrest will be denied.

## II.    TAYLOR'S POST-ARREST STATEMENTS
##        WILL BE SUPPRESSED IN PART

            Taylor has moved to suppress two post-arrest statements.  The parties agree that

Taylor was in custody and that Miranda warnings had not been administered to him at the time

the statements were made (Tr. 41, 44), but the Government alleges that the statements were made

---

stranger carrying speakers, who agreed to sell them for $25; paid for the speakers with a $100
bill, and received $75 in change.  (Dratel Decl., Ex. 1 (Taylor Decl.) ¶ 9)  At the time of his
arrest minutes later, however, Taylor was carrying only $45.  (Tr. 16, 17, 32)

[14]  Although the drugs were never recovered – because the second man fled after the police
approached – this Court is entitled to consider Officer Mejia's experience in weighing his
assertion that Taylor passed his companion a package of crack cocaine.  See Arias, 2011 WL
1332190, at *3 ("When making a probable cause determination, '[t]he experience of a [law
enforcement] officer is a factor to be considered.'" (quoting Fisher, 702 F.2d at 378)).  Here,
Officer Mejia testified that he saw Taylor pass a clear package wrapped in Saran Wrap to his
companion.  The package contained a number of small, colored ziplock bags.  Based on his
experience, Mejia testified that the small, colored ziplock bags are commonly used to sell crack;
the color is used to brand the crack.  (Tr. 79, 81-82)  The Court credits Officer Mejia's account.

spontaneously. (Gov't Post-Hearing Br. 9-10) Taylor claims that both statements were made in response to police questioning and must therefore be suppressed. (Def. Post-Hearing Br. 17-20)

A.   **Legal Standard**

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court ruled that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning. . . . [the following] [p]rocedural safeguards must be employed to protect the privilege [against self-incrimination]:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Miranda, 384 U.S. at 478-79.

"The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007) (citing Miranda, 384 U.S. at 444-45). Only unwarned statements made after interrogation are barred, however. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment." Miranda, 384 U.S at 478. For

10

purposes of <u>Miranda</u>, "interrogation" "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 292 (1980).

Where a defendant "has alleged police custodial interrogation in the absence of <u>Miranda</u> warnings, the burden shifts to the government to prove <u>Miranda</u> voluntariness, either because there was no custodial interrogation implicating <u>Miranda</u>, there was some exception to the <u>Miranda</u> rule, or because [the defendant] was properly <u>Mirandized</u> and waived his rights." <u>United States v. Miller</u>, 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005) (citing <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972); <u>United States v. Anderson</u>, 929 F.2d 96, 98 (2d Cir. 1991)).

**B.      Analysis**

Two post-arrest statements are at issue here:  (1) Taylor's statement – in the presence of Detectives Leon and Slater – that "he ran because he had bud and that he threw it [away]"; and (2) his statement to Detective Slater – when the detective found United States currency in Taylor's jacket – that "[t]hat's not marked money, my sister gave that to me."  (Tr. 16)  The Government contends that these statements were made spontaneously, while Taylor alleges that he made the statements in response to police questioning.  The Court concludes that the first statement was not made spontaneously, and therefore must be suppressed.  The Government has met its burden as to the second statement, however, and Taylor's motion will be denied as to that statement.

As to the first statement, Taylor states in his declaration that after his arrest, an officer said to him, "You knew we were cops.  Why did you try to run?"  (Dratel Decl., Ex. 1 (Taylor Decl.) at ¶ 11)  Taylor does not report his answer, but states that the officer's follow up

11

question was, "Where's the weed?" (Id.)  The Government alleges that Taylor spontaneously

explained his conduct by stating that "he ran because he had bud."  (Tr. 16)

        The Government has not rebutted Taylor's showing that his statement about

possessing marijuana was made in response to interrogation.  According to the testimony at the

hearing, when Detective Slater arrived at the scene of Taylor's arrest, Taylor was already telling

his story about possessing marijuana:

> Q.    . . . . When you saw Javel Taylor, what was he doing?
>
> A.    He was on the ground handcuffed with his hands behind his back.
>
> Q.    Were there any other officers in the area?
>
> A.    Just Detective Leon.
>
> Q.    What was Detective Leon doing?
>
> A.    He was standing above him.
>
> Q.    As you approached, did the defendant do anything?
>
> A.    Yes.
>
> Q.    What did he do?
>
> A.    He was talking.
>
> Q.    What was he saying?
>
> A.    He was saying he ran because he had bud and that he threw it.

(Tr. 16)

        It is clear from Detective Slater's testimony that Taylor was already speaking

when Detective Slater arrived at the scene.  Accordingly, he has no personal knowledge as to

whether Detective Leon asked Taylor why he ran when Detective Leon approached.  Detective

Leon – who testified at the hearing – was not asked whether he questioned Taylor.  Under these

circumstances, the Government has not rebutted Taylor's showing that he was questioned after his arrest about why he ran.[15]  Because a question about why Taylor ran is "reasonably likely to evoke an incriminating response," it "amounts to interrogation."  Innis, 446 U.S. at 301. Accordingly, Taylor's motion to suppress the first statement will be granted.

With respect to the second statement – "[t]hat's not marked money, my sister gave that to me" – the Court finds that the Government has met its burden of proving that the statement was spontaneous.  Taylor's declaration does not address this statement; accordingly, Detective Slater's account is uncontested.  Moreover, it is entirely plausible that Detective Slater's mere recovery of the marked money from Taylor's jacket – without any questioning about the money – would elicit an immediate and spontaneous false exculpatory statement.

The Court finds that Detective Slater's search of Taylor's jacket was an action "normally attendant to arrest and custody."  Innis, 446 U.S. at 292.  The Court further finds that Taylor's "disclaimer was spontaneous and not precipitated by police interrogation, [and thus] was not subject to Miranda.  There was no police intimidation, coercion or deception, and the statement was voluntary.  Accordingly, it is admissible unless tainted [by the previous exchange concerning why Taylor ran]."  See Miller, 382 F. Supp. 2d at 374.

The Court finds that Taylor's statement concerning the marked money was not tainted by his earlier statement explaining why he ran.  The later statement "was spontaneous and not prompted by any interrogation whatsoever.  Furthermore, the statement bore no rational relationship to the impermissible question that preceded it.  In other words, [Taylor's] remark was not prompted by, or a natural continuation of, the earlier question" concerning why he ran.

---

[15]  It is also plausible, under the circumstances here, that Taylor would have told a story about possessing "bud" in response to a question about why he ran.  Assuming arguendo that the Government's charges against Taylor are correct, Taylor's answer is in the nature of a false exculpatory statement.

See id. at 374-75 (considering "what impact a suppressed, non-Mirandized, custodial statement has on . . . subsequent statements that were . . . volunteered"). In particular, because the first statement was – in the context of this crack cocaine "buy and bust" operation – exculpatory rather than inculpatory, there is no reason to believe that Taylor's admission about "bud" motivated his statement about the money in his possession.

Accordingly, Taylor's motion to suppress will be granted as to his statement explaining why he ran, but denied as to his statement concerning the marked money.

## CONCLUSION

Defendant Taylor's motion to suppress the physical evidence recovered at the time of his arrest is denied. Taylor's motion to suppress his post-arrest statements is granted in part and denied in part, as explained above. The Clerk of the Court is directed to terminate the motion (Dkt. No. 9).

Dated: New York, New York
        September 19, 2011

SO ORDERED.

Paul G. Gardephe
United States District Judge

14