```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/7/12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JAVEL TAYLOR,

                       Defendant.

**ORDER**

11 Cr. 310 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendant Javel Taylor was charged in a two-count indictment with (1) conspiring to distribute, and possess with intent to distribute, crack cocaine, and (2) distributing and possessing with intent to distribute crack cocaine. On December 1, 2011, after a three-day trial, a jury convicted Taylor on both counts.

        Taylor has moved for a judgment of acquittal on the conspiracy count pursuant to Fed. R. Crim. P. 29(c) and for a new trial on Count Two pursuant to Fed. R. Crim. P. 33. For the reasons stated below, Taylor's motion will be denied in its entirety.

## BACKGROUND

### I. THE GOVERNMENT'S EVIDENCE AT TRIAL

        This case involves a crack cocaine transaction in the Frederick Douglass Houses on the Upper West Side of Manhattan. The evidence at trial established that on March 21, 2011, the primary undercover officer[1], Detective Jose Rodriguez, approached an individual who he later learned was Leonard Fitzgerald on West 103rd Street between Broadway and Amsterdam Avenue. (Tr. 125-27, 166) Detective Rodriguez posed as a user of crack cocaine and told Fitzgerald that he wanted to purchase crack. (Tr. 126, 128) During their conversation, Detective

---

[1] The role of a primary undercover officer is to engage members of the community in conversation and attempt to purchase narcotics. (Tr. 114)

Rodriguez asked Fitzgerald to contact an individual who went by the nickname "J." (Tr. 128, 144) Fitzgerald stated that he knew "J" "from the projects" and that if the undercover officer gave Fitzgerald his cell phone, he would call "J" and arrange for the undercover office to obtain crack cocaine from "J." (Tr. 128, 144) The officer entered a telephone number provided by Fitzgerald and handed the phone to him. The officer then overheard Fitzgerald discussing a quantity of crack cocaine – four "dime" bags – and a location – 103rd Street and Amsterdam Avenue in Manhattan. (Tr. 128-29) After the telephone call, Detective Rodriguez and Fitzgerald walked to the corner of 103rd Street and Amsterdam Avenue. (Tr. 130-32)

Detective Rodriguez testified that after he and Fitzgerald arrived at that location, Fitzgerald told Detective Rodriguez that he saw "J" – the individual who was going to sell the crack cocaine – approaching. (Tr. 132) Once "J" – later identified as Defendant Javel Taylor – approached, Fitzgerald asked Detective Rodriguez to "take a few steps away" because he knew Taylor better and would be able to obtain the crack cocaine from Taylor and bring it to Detective Rodriguez. (Tr. 133-34) As Taylor approached, Detective Rodriguez gave Fitzgerald $40 in pre-recorded buy money with which to purchase the crack cocaine from Taylor. (Tr. 130, 149-51)

Detective Rodriguez then observed Taylor and Fitzgerald engage in a short conversation, after which they walked across Amsterdam Avenue to the Frederick Douglass Houses and entered a building located at 860 Columbus Avenue. (Tr. 134-35) Detective Rodriguez followed and waited at the entrance of 860 Columbus Avenue. (Tr. 136-37)

A short time later, Fitzgerald exited the building and he and Detective Rodriguez walked north towards 104th Street through the courtyards of the Frederick Douglass Houses. (Tr. 137-38) Fitzgerald advised Detective Rodriguez that he had obtained the crack cocaine

from "J" and that he would give it to Detective Rodriguez once they walked away from the building. (Tr. 138) Fitzgerald apologized for walking away from the officer earlier when "J" approached, explaining that "J" was "a little suspicious, a little bit raised . . . but that everything was OK." (Tr. 138)

Once Fitzgerald and Detective Rodriguez reached a parking lot on the south side of 104th Street, Fitzgerald handed Detective Rodriguez four "small black-tinted zips" – that is, small Ziploc bags – of crack cocaine, which he retrieved from his mouth. (Tr. 139) At that point, Detective Rodriguez advised other NYPD officers in the area that he had purchased crack cocaine and provided them with Fitzgerald's location. (Tr. 60, 139, 169) Fitzgerald was then arrested. (Tr. 60, 139) Detective John Paul Slater, the arresting officer, searched Fitzgerald and recovered a slip of paper containing the letter "J" and the telephone number Fitzgerald had earlier provided to the undercover officer. (Tr. 44, 60-62, 129)

After Detective Rodriguez purchased crack cocaine from Fitzgerald, Officer Wyatt Jeffers, the ghost undercover officer,[2] and Officer Melvin Mejia, another member of the field team, observed Taylor standing in front of 860 Columbus Avenue with a man wearing a grey hooded sweatshirt. (Tr. 170-71, 200) As Taylor and the other man walked southbound, Taylor handed him a clear bag containing small dark-colored Ziploc bags, the type of packaging used for crack cocaine. (Tr. 171, 201-02) The other individual placed the package in his sock or shoe. (Tr. 171, 202)

Taylor was then arrested. (Tr. 204) His companion fled when the police approached. (Tr. 204-05) Office Mejia chased this individual into Central Park, but he escaped.

---

[2] The role of the ghost undercover is to ensure the safety of the primary undercover, to observe events, and to communicate with the field team as to the location and actions of the primary undercover. (Tr. 114-15)

(Tr. 205-06) Detective Slater searched Taylor's jacket and recovered $45, which included the $40 in pre-recorded buy money that Detective Rodriguez had provided to Fitzgerald to purchase the crack cocaine. (Tr. 73-74) As Detective Slater removed the money from Taylor's jacket, Taylor stated, "That's not marked money. My sister gave that to me." (Tr. 75)

## II. THE DEFENSE CASE

The defense called Dema Jones, whose boyfriend is a friend of Taylor's. (Tr. 255) Jones testified that she was with Taylor during the afternoon of March 21, 2011, at 860 Columbus Avenue, where her boyfriend lives. (Tr. 255-56) Jones testified that Taylor picked up his niece from school that day and then came to her boyfriend's apartment. (Tr. 255-56) Jones further testified that she, Taylor, and Taylor's niece left 860 Columbus Avenue together, and that she then took Taylor's niece to a store near the Frederick Douglass Houses to get something to eat. (Tr. 257) When Jones and Taylor's niece returned from the store approximately 10 minutes later, she saw that Taylor had been placed under arrest. (Tr. 257) Jones referred to Taylor as "J" during her testimony. (Tr. 258)

## DISCUSSION

## I. RULE 29 MOTION

Taylor argues that his conspiracy conviction must be vacated, and a judgment of acquittal entered, because the Government "failed to prove beyond a reasonable doubt that there was an unlawful agreement between Mr. Taylor and another individual, in this case his alleged co-conspirator, Leonard Fitzgerald." (Def. Br. 2) (emphasis in original) Taylor maintains that the evidence "demonstrated only that Mr. Fitzgerald was a 'steerer' in the drug transaction, and not a co-conspirator." (Id.)

Under Rule 29, a court must, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29. A defendant challenging the sufficiency of the evidence pursuant to Rule 29 "bears a heavy burden." United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (citation omitted). "The jury verdict must be upheld if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987) (emphasis in original).

"In evaluating whether the evidence was sufficient to convict a defendant, [a reviewing court] consider[s] all of the evidence, both direct and circumstantial, 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'" United States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001) (quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999)). The court "must be careful to avoid usurping the role of the jury." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). "[U]pon a motion for judgment of acquittal, 'the Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."'" Guadagna, 183 F.3d at 129 (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)). "Rule 29(c) does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" Id. (citation omitted).

"To convict a defendant of conspiracy, the government must prove beyond a reasonable doubt 'both the existence of the conspiracy alleged and the defendant's membership in it.'" United States v. Farhane, 634 F.3d 127, 144 (2d Cir. 2011) (citation omitted). "The essence of any conspiracy is, of course, agreement, and in order to establish a conspiracy, the government must show that two or more persons entered into a joint enterprise with consciousness of its general nature and extent." United States v. Chavez, 549 F.3d 119, 125 (2d Cir. 2008). A "'conspiratorial agreement[, however,] . . . may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement . . . .'" United States v. Santos, 541 F.3d 63, 71 (2d Cir. 2008) (citation omitted). The Second Circuit has noted that "[w]hen a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" Id. at 70 (quoting United States v. Morgan, 385 F.3d 196, 204 (2d Cir. 2004)).

Here, the jury was instructed, as to the conspiracy count, that the Government was required to prove the following elements beyond a reasonable doubt:

> First, the government must prove the existence of the conspiracy charged in Count 1; in other words, that there was, in fact, an agreement or understanding to violate those provisions of the law that make it a crime to distribute cocaine base, or to possess cocaine base with the intent to distribute it.
>
> Second, the government must prove that the defendant, Javel Taylor, knowingly became a member of the conspiracy; that is, that he knowingly associated himself with the conspiracy, and participated in the conspiracy to distribute and possess with intent to distribute cocaine base.

(Tr. 351-52) Taylor has not challenged the Court's instruction.

At trial, the Government presented sufficient evidence to prove beyond a reasonable doubt that Taylor participated in a conspiracy with Fitzgerald to sell crack cocaine at the Frederick Douglass Houses in Manhattan. As noted above, the Government offered evidence that Fitzgerald told Detective Rodriguez that he knew an individual nicknamed "J" who would be able to sell crack cocaine to the officer. (Tr. 128, 144) Fitzgerald then called "J" to arrange a sale of four bags of crack cocaine for $40. (Tr. 128-29) After the telephone call, Taylor approached Fitzgerald – who advised Detective Rodriguez that "J" was approaching – and Fitzgerald told Detective Rodriguez to step away because he knew Taylor better and would be able to obtain the crack for Detective Rodriguez. (Tr. 132-34) Fitzgerald and Taylor then proceeded to 860 Columbus Avenue together. (Tr. 134-35) A short time later, Fitzgerald emerged and told Detective Rodriguez that he had obtained the crack cocaine from "J." (Tr. 138)

This evidence of an agreement between Fitzgerald and Taylor was corroborated by physical evidence recovered from Fitzgerald and Taylor after their arrests. Fitzgerald had a slip of paper with the telephone number for "J" written on it (GX 102), and the $40 in pre-recorded buy money that Detective Rodriguez provided to Fitzgerald to purchase crack cocaine was recovered from Taylor's jacket after his arrest. (GX 101) Viewing this evidence in the light most favorable to the Government, a reasonable jury could infer that there was an agreement between Fitzgerald and Taylor to distribute crack cocaine.

Taylor argues that "[f]rom the start of the government's case to the finish, the government presented Mr. Taylor as a drug seller, and Mr. Fitzgerald as a mere 'steerer'" – that is, someone who merely helps a willing buyer locate a willing seller. (Taylor Br. 4) Taylor maintains that "[b]y confining Mr. Fitzgerald's role in the drug transaction to that of a 'steerer,'

7

it is clearly established under Second Circuit case law that the government did not present sufficient evidence for the jury to conclude that Mr. Taylor conspired with Mr. Fitzgerald to distribute, or to possess with intent to distribute, cocaine base in violation of 21 U.S.C. § 846." (Id. at 4-5)

Taylor relies on United States v. Tyler, 758 F.2d 66 (2d Cir. 1985), in which the Second Circuit held that "evidence adduced by the government merely show[ing] that [an individual] helped a willing buyer locate a willing seller . . . , standing alone, is insufficient to establish the existence of an agreement between the facilitator and the seller." Id. at 69. Tyler, however, is readily distinguished. In that case, an undercover officer told Tyler that he was looking for "'good dope.'" Id. at 67. Tyler told the undercover that he would "'take care of [him].'" Id. Tyler then approached an unidentified individual and made "some type of inquiry." Id. at 68. Tyler next engaged James Bennett, who approached the undercover and asked "'how many did [he] want.'" Bennett then sold the undercover three glassine envelopes of heroin. Id. at 67. After the transaction, Tyler approached the undercover officer and asked for some change. Id. at 68.

In reversing Tyler's conspiracy conviction, the Second Circuit noted that "[c]onspicuously absent . . . is any evidence that Tyler asked [the undercover officer] how much heroin he sought to purchase, that Tyler indicated he had a specific source of heroin in mind for [the undercover officer], that Tyler knew where to find Bennett or expected him to be in the area, or that Tyler had made any previous deals with Bennett." Id. at 68-69.

Here, by contrast, the Government offered evidence that Fitzgerald knew Taylor to be a source of crack cocaine and knew how to contact him. The undercover also overheard Fitzgerald's telephone call with Taylor, in which he asked for the four "dime" bags. The

8

conspiratorial relationship between Fitzgerald and Taylor was further confirmed by Fitzgerald's possession of the slip of paper with "J's" telephone number and the fact that officers recovered from Taylor the $40 in pre-recorded buy money that the undercover officer had given to Fitzgerald. In short, the facts here are entirely dissimilar to those in Tyler.

The other cases cited by Taylor are similarly inapposite. In both United States v. Hysohion, 448 F.2d 343 (2d Cir. 1971) and United States v. Torres, 519 F.2d 723 (2d Cir. 1975), the defendant merely advised a willing buyer how to make contact with a willing seller. Hysohion, 448 F.2d at 347; Torres, 519 F.2d at 726. As discussed above, there is much more evidence here.

Taylor's motion for a judgment of acquittal on Count One will be denied.

## II.     RULE 33 MOTION

Taylor argues that his conviction on Count Two of the Indictment, the substantive offense, must be vacated and a new trial ordered because the Court erred in giving an aiding abetting charge.[3] (Def. Br. 10) Taylor contends that "the evidence at trial could not have established Mr. Taylor as an aider and abettor, and the only conceivable basis for liability presented by the government with respect to Mr. Taylor was as a principal." (Id.) (emphasis in original) Taylor maintains that "[t]he evidence at trial – in particular evidence regarding Mr. Fitzgerald's marginal role as 'steerer,' and Mr. Taylor's alleged principal role as drug seller – eliminated the possibility of Mr. Taylor aiding and abetting Mr. Fitzgerald's commission of Count Two." (Id. at 12)

Fed. R. Crim. P. 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice requires." FED. R. CRIM. P.

---

[3] Over Taylor's objection, the Court instructed the jury that it could find Taylor guilty on Count Two as an aider and abettor. (Tr. 270, 278, 365-67)

9

33(a). "[A] trial court exercises 'broad discretion' in ruling on a new trial motion . . . ." United States v. Canova, 412 F.3d 331, 348 (2d Cir. 2005). "The standards governing Rule 29 and Rule 33 motions are similar but not identical." United States v. Ghailani, 761 F. Supp. 2d 167, 195 (S.D.N.Y. 2011). "Though a district court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses,' it 'must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the role of the jury.'" United States v. Triumph Capital Group, Inc., 544 F.3d 149, 159 (2d Cir. 2008) (citations omitted). "'[M]otions for new trials are not favored and should be granted only with great caution.'" United States v. Stringer, No. S 10 Cr. 632(GEL), 2012 WL 11269, at *5 (S.D.N.Y. Jan. 3, 2012) (quoting United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958)). "While courts have 'broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29,' they 'nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" Triumph Capital Group, 544 F.3d at 159. "The 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice. . . . There must be a real concern that an innocent person may have been convicted.'" Canova, 412 F.3d at 349 (citations omitted). There is no basis for such a concern here.

As an initial matter, Taylor's argument that he is entitled to a new trial because the Government demonstrated that he was a principal – the "drug seller" – rather than an aider and abettor (Def. Br. 10, 12) is misguided. The Second Circuit has repeatedly held that where the evidence demonstrates a defendant's guilt as a principal, there is no basis for vacating an aiding and abetting conviction. United States v. Becerra, 97 F.3d 669, 672 (2d Cir. 1996) ("Moreno's conviction as an aider and abettor was not erroneous since the jury had ample evidence on which to convict her as a principal."); United States v. Knoll, 16 F.3d 1313, 1323

(2d Cir. 1994) ("We have held that an indictment charging aiding and abetting may be proven by demonstrating that the aider and abettor was in fact a principal.") Assuming arguendo that the Government proved Taylor's guilt as a principal rather than as an aider and abettor, Taylor is entitled to no relief. In any event, as discussed below, the proof was sufficient to support Taylor's conviction on an aiding and abetting theory.

"[T]he requirements for the offense of aiding and abetting are '"that [a defendant] in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed." Tyler, 758 F.2d at 70 (citations omitted). "To convict a defendant of aiding and abetting a substantive crime, the government must prove that 'the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime.'" United States v. Cain, 671 F.3d 271, 303 (2d Cir. 2012) (citation omitted). "[A]iding and abetting requires [that] there be a 'community of unlawful intent' between the aider and abettor and the principal." Tyler, 758 F.2d at 70. "'[W]hen a person is charged with aiding and abetting the commission of a substantive offense, the "crime charged" is . . . the substantive offense itself.'" United States v. Smith, 198 F.3d 377, 383 (2d Cir. 1999) (citation omitted).

Here, there is sufficient evidence to support a finding that Taylor aided and abetted Fitzgerald in conducting the crack cocaine transaction with Detective Rodriguez. The jury could reasonably have found that Taylor had knowledge of Fitzgerald's intention to provide crack cocaine to Detective Rodriguez, that he associated himself with that venture, and that he took action to bring about or facilitate Fitzgerald's distribution of crack cocaine to the undercover officer by supplying the crack cocaine in response to Fitzgerald's request. Given that

11

there was no direct contact between the undercover officer and Taylor, and that it was Fitzgerald and not Taylor who did the hand-to-hand transaction with the undercover officer, the jury could have found that Fitzgerald was the principal in the transaction and that Taylor aided and abetted Fitzgerald's commission of the offense.

In arguing that it was error to give an aiding and abetting charge, Taylor relies on United States v. Resto, 824 F.2d 210 (2d Cir. 1987) and United States v. Hysohion, 448 F.2d 343 (2d Cir. 1971). Neither case supports his argument. In Resto, the Court upheld the aiding and abetting conviction of a "steerer," Resto, 824 F.2d at 212, while in Hysohion, the Court reversed conspiracy convictions, finding that the Government had not offered proof of an unlawful agreement. Hysohion, 448 F.2d at 347. These cases do not address the circumstances in which it is proper to give an aiding and abetting instruction.

Taylor's Rule 33 motion concerning Count Two will be denied.

## CONCLUSION

Defendant Taylor's motion for a judgment of acquittal and for a new trial is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 48).

Dated: New York, New York
      June 6, 2012

SO ORDERED.

*Paul G. Gardephe*
Paul G. Gardephe
United States District Judge