CBSJTAYS                        Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                        11 Cr. 310 PGG

5   JAVEL TAYLOR,

6                   Defendant.

7   ------------------------------x

8

9                                            November 28, 2012
                                             11:15 a.m.
10

11

12  Before:

13                      HON. PAUL G. GARDEPHE,

14                                          District Judge

15

16                          APPEARANCES

17

18  PREET BHARARA,
         United States Attorney for the
19       Southern District of New York
    RYAN P. POSCABLO,
20       Assistant United States Attorney

21

22  JOSHUA L. DRATEL,
    LINDSAY A. LEWIS,
23       Attorneys for defendant Taylor

24

25

CBSJTAYS                         Sentence

1          (In open court)

2          (Case called)

3          THE COURT:  All right.  This matter is on my calendar

4     for the purposes of sentencing.  I have read the presentence

5     report, dated February 22nd, 2012.  I have read Mr. Dratel's

6     June 25th, 2012 submission, his September 4th, 2012 reply

7     submission, along with letters from Mr. Taylor's family and Mr.

8     Taylor that was submitted at that time.  I have also read the

9     government's August 21st, 2012 submission.

10          Mr. Dratel, have you read the presentence report and

11     its recommendation and discussed it with Mr. Taylor.

12          MR. DRATEL:  Yes, I have.

13          THE COURT:  Mr. Taylor, have you read the presentence

14     report, its recommendation and discussed it with Mr. Dratel?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Now, there have been some written

17     objections to the presentence report which I will address.  Mr.

18     Dratel has objected to Paragraphs 9 through 11 of the

19     presentence report which discuss Mr. Taylor's commission of the

20     crimes for which he was convicted.  I reject those objections

21     because it was my view that the evidence at trial fully

22     supports the factual assertions in Paragraphs 9 through 11 of

23     the presentence report.

24          Mr. Dratel has also objected to Paragraph 33, which

25     contains a discussion of Mr. Taylor's December 13th, 2007

CBSJTAYS                              Sentence

conviction.  As you know from my decision, I have included this

conviction for possession of a controlled substance with intent

to sell.

Are there any other objections to the factual portions

of the presentence report you want to make, Mr. Dratel?

MR. DRATEL:  No, your Honor.  The others have to do

with the career offender enhancement itself as well.  They're

in my letter, so I don't need to repeat them.

THE COURT:  Okay.  Mr. Poscablo, does the government

have any objections to the factual portions of the presentence

report?

MR. POSCABLO:  No, your Honor.

THE COURT:  I hereby adopt the findings of fact set

forth in the presentence report.

Although I am not required to impose sentence in

accordance with the sentencing guidelines, I am required to

consider the recommended sentencing range under the guidelines.

Here the Probation Department determined that Mr. Taylor's base

offense level is 12 because the cocaine base amount

attributable to him is less than 1.4 grams,.

However, the Probation Department determined, pursuant

to Section 4B1.1 of the guidelines, that the defendant is a

career offender because:

One, he was at least 18 years of age at the time of

the instant offenses;

CBSJTAYS                          Sentence

1          Two, the instant offenses of conviction are felonies

2     that constitute controlled substance offenses; and

3          Three, the defendant had at least two prior felony

4     convictions in this case for controlled substance offenses.

5          Under Section 4B1.1 (b) of the guidelines, the

6     defendant's offense level is the greater of the levels set

7     forth in the table and Section 4B1.1 (b) or the otherwise

8     applicable offense level.  Here the Probation Department

9     determined that Mr. Taylor's offense level is 34 because the

10    maximum penalty for the offenses of conviction is 30 years of

11    imprisonment.

12         The Probation Department further determined that Mr.

13    Taylor has a criminal history that yields a total of 8 criminal

14    history points, which would put him in Criminal History

15    Category IV.  However, because Probation determined that Mr.

16    Taylor is a career offender under Section 4B1.1 (b), his

17    criminal history category is automatically Category VI.

18    Offense Level 34, at criminal history Category VI, yields a

19    guidelines range of 262 to 327 months imprisonment.

20         Now, the defense has objected to classification of Mr.

21    Taylor as a career offender.  In particular, Mr. Dratel has

22    objected to Paragraphs 25, 38 and 80 of the presentence report

23    to the extent that these paragraphs treat or identify Mr.

24    Taylor as a career offender.  As you know, I have rejected Mr.

25    Dratel's arguments with respect to the career offender

1    classification.  Accordingly, I will overrule his objections to

2    the presentence report to the extent that they are based on the

3    classification of Mr. Taylor as a career offender.

4              Mr. Dratel, are there any other objections you want to

5    make with respect to the accuracy of the guidelines

6    calculations in the presentence report?

7              MR. DRATEL:  No, your Honor.

8              THE COURT:  Does the government have any objections?

9              MR. DRATEL:  May I just, because the sentencing law

10   has evolved in some way, just to state the objection based on

11   the Court's opinion; in other words, just to state the

12   objection?

13             THE COURT:  Go ahead.

14             MR. DRATEL:  Just that we continue our objection to

15   the career offender classification.

16             THE COURT:  All right.  Mr. Poscablo, does the

17   government have any objections to the accuracy of the

18   guidelines calculation in the presentence report?

19             MR. POSCABLO:  It does not, your Honor.

20             THE COURT:  Based on my independent evaluation of the

21   sentencing guidelines as well as the opinion I issued earlier

22   this morning discussing why I believe that Mr. Taylor is a

23   career offender under sentencing guidelines, I am accepting the

24   calculations set forth in the presentence report.

25             Accordingly, I find that the applicable offense level

CBSJTAYS                              Sentence

1   is 34, the criminal history category is VI, and the applicable

2   guidelines range is 262 to 327 months imprisonment.

3          Mr. Dratel, I'll hear from you as to an appropriate

4   sentence.

5          MR. DRATEL:  Thank your Honor.

6          I know that the court has read the submission, so I

7   will not go through them in detail.  I will try to concentrate

8   on what I think are the important principles in the context of

9   sentencing.  I also wanted to note Mr. Taylor's sister is here.

10  There are other family members who could not make it because of

11  work schedules, but they continue to support Mr. Taylor and

12  visit him on a regular basis, so family support is still

13  intact.

14         I think I want to start and end in the same place

15  which is called the parsimony clause in 3553 (a), sufficient

16  but not greater than necessary.  That is what the sentence

17  should be, and the factors mitigate substantially from the

18  guidelines range so that the guideline range really represents

19  an extreme, is not appropriate here and not even close to

20  appropriate here in terms of the sentence that will be

21  sufficient but not greater than necessary.

22         Just to start off with one of the technical parts is

23  just a departure in the sense the court is permitted to depart

24  one level for the criminal history category, from Level 6 to

25  Level 5, this statutory restriction in terms of how far you can

1    go on a departure for overstating the nature of the criminal

2    history.  In the context of the analysis of the career

3    offender, the convictions that form the basis for career

4    offender guideline and also rather the classification and also

5    the nature of those offenses, their terms of being what would

6    be considered at least in the federal context and even in the

7    state context as relatively minor drug offenses, that one-level

8    departure is appropriate as a threshold issue even before we

9    get to 3553 (a).

10            3553 (a), I think the important factors, there are

11    several.  One I think is very important is the concept of the

12    type of guideline that the career offender guideline represents

13    which is not a guideline based on empirical data collected by

14    the Sentencing Commission as to where along the range of that

15    vertical axis a sentence should fall and where, it is a number

16    essentially picked out of the air.

17            In the Dorvy case which we briefed extensively in the

18    papers establishes that in the context of a different

19    guideline, but I think the analogy is right on point in the

20    sense that you have a guideline that does not reflect that

21    empirical data like other guidelines do.

22            On one hand, it doesn't necessarily give the court the

23    kind of guidance those other guidelines do, that this would be

24    something that somehow is reflective of where sentences are,

25    have been and ought to be.

1          The second part is that consistent with the Supreme

2     Court and Second Circuit obviously following that, Kimbrough

3     and Gall and the Second Circuit following is that it is the

4     type of guideline that the court is free to disregard in terms

5     of not as a totality in terms of calculating the guidelines,

6     but in terms of where the sentence falls.

7          THE COURT:  Let me ask you this.  We have somebody who

8     has four prior drug offenses including three felonies,

9     convicted of two additional drug felony convictions in this

10    case.  The career offender provision would appear to be

11    designed in part to address somebody who has committed

12    repeatedly drug trafficking crimes and has shown an

13    unwillingness to abide by the law such that it is necessary to

14    take him out of the community for a very extended period of

15    time.

16         Wouldn't you agree that appears to be the logic of it?

17         MR. DRATEL:  I think that is an abstract logic of it,

18    but in the context of where those guidelines fall, I think that

19    the considered judgment of the courts across the country, 65

20    percent in 2010 were sentencing below the career offender

21    guidelines.  The considered judgment of courts addressing that

22    have found that to be way too high to achieve that goal, and if

23    you look at sufficient but not greater than necessary, I agree

24    with the court in the context of what you have to look at.  To

25    me it is a question of projecting in the future to say what is

```
 1    it that is needed to achieve that goal, whether it is a career

 2    offender goal or guideline goal in general.

 3              THE COURT:  Let me address that because what you have

 4    said is that it is your belief that a sentence within the range

 5    of 21 to 27 months would be adequate to meet all the objectives

 6    of sentencing.  My question for you in that regard is your

 7    client received a sentence of 42 months in December of 2007,

 8    and he served a significant period of incarceration, I think it

 9    was 25 months on that sentence, was released on parole, 10 days

10    later was arrested on another drug case.

11              So given that backdrop, how could you possibly suggest

12    to me that it is rational for me to conclude that a sentence of

13    21 to 27 months would be adequate to address the need for

14    deterrence as well as the safety of the community?  Isn't there

15    a track record?  He was given a significant sentence, he served

16    the sentence, was released on parole, 10 days later arrested on

17    another drug case, six months later arrested in this case.  How

18    could I possibly conclude that 21 months is enough to deter him

19    in the future?

20              MR. DRATEL:  I will try to answer that two ways.

21              One is with respect to the 21 to 27, this is a

22    different type of case for Mr. Taylor.  It is his first

23    experience with federal court.  I think there is a dramatic

24    difference in defendants' approach to cases, to sentencing, to

25    the future in the context of their experience in federal court.
```

1          Their experience in the MCC for the length of time he

2     has been in there, what he sees what happens to people who get

3     caught up in the federal system, I think it has been a

4     significant lesson, one we had never had before.  I think his

5     letter reflects a lot of introspection and self-reflection that

6     had not occurred before.

7          I think that oftentimes in these situations there is a

8     revolving door aspect of it in state court that doesn't

9     necessarily address long-term issues.  I think that the gravity

10    of the potential sentence in this case, the gravity of the

11    nature of federal court in general has had a salutary effect in

12    that with regard for Mr. Taylor, for his family and for the

13    recognition that this could be -- this is a life-changing event

14    either way.  Whatever the court sentences Mr. Taylor to, this

15    is a life-altering event, whether it is for the length of time

16    the court thinks is reasonable for the purposes of sentencing

17    or for the 21 to 27 month range that we're urging.

18         Either way it is a life-altering effect for him.  I

19    think that even, and there is no -- I concede that there is a

20    sentence above 27 months that is reasonable.  To me part of

21    that, what I am trying to present today is that reasonable

22    sentence does not go nearly as high in the stratospheric

23    numbers the guidelines would confer.  There is a range that is

24    reasonable, obviously, between there.

25         I think, though, it is much further down, much closer

to 27 months than it is to 262.  If you look at what he would

get in the state court even, obviously that is a reflection of

the seriousness of offense.  These are NYPD officers who made

the arrest.  These are NYPD officers who processed him and

questioned him, these are NYPD officers who turned him over to

the federal system.  If you look at the state system where it

is between 2 to 12 with shock treatment, with shock -- when I

say "shock treatment," S H O, S H O C K, treatment of the

sentence, the program in the state system, he got early

release.

          Those are the kind of things I think are of extreme

importance.  I think say reasonable minds can differ as to the

actual sentence as to what might be adequate.  I know Mr.

Taylor now since the beginning of the case and I find a marked

change in his maturity level, his recognition of his situation

in that his chances for leading a productive life are down to,

they whittle down to in one sense what happens here today and

what happens when he is done with what happens here today.  I

think that has had a significant effect on him.

          That is essentially all I can say after that issue.  I

don't know if the court has any further questions about that

particular.  That is where I come out on that.

          THE COURT:  All right.

          MR. DRATEL:  There are also cases, and we put them in

our papers, that talk about the nature of prior records like

1    Mr. Taylor's and very much the type that your Honor described.

2    The Moreland case in particular and others that still try to

3    find a medium that is rational and still achieves the goals of

4    sentencing sufficient but not greater than necessary that are

5    actually far closer to the guidelines that the defendant would

6    face than the career offender guidelines that the defendant

7    would face.

8            Obviously, that is another factor.  The deterrence

9    purpose of the career offender guidelines does not require 262

10   months or anything close to that.  Projecting into the future,

11   if the court thinks of what level of sentence would achieve

12   what the court wants to achieve at sentencing and what the

13   statute wants the court to achieve at the sentencing, I think

14   262 months is off the charts and a fraction of that will

15   suffice.

16           I want to dovetail that in the context of Mr. Taylor's

17   personal background which has its difficulties, many of which

18   have been unattended either by himself or by the system as a

19   whole, and he does not put the blame on the system in that

20   regard.

21           He acknowledges his own inability to take advantage of

22   the things that were offered to him in his life through family

23   and elsewhere, but the fact is that he does fall into that

24   category.  The kind of guidelines the presentence report

25   cavalierly in a certain sense recommends are not going to

1   change that.  Something much shorter than that will be able to

2   do that.  If you talk about programming and things that are

3   available in a custodial setting, I have seen almost in all

4   instances people like Mr. Taylor almost universally a far

5   shorter term of incarceration is sufficient to allow people

6   that time to find the maturation and to find their place in the

7   world where they can be a law-abiding citizen and productive

8   citizen with a family and young child who has not really had a

9   chance to -- were born while he was in prison.

10          Those are tragic circumstances, very human

11   circumstances, and I think they do factor into sentencing

12   particularly when you look at the distribution of sentences in

13   these kinds of cases where 65 percent are below the career

14   offender guidelines, where 70 percent of the cases in this

15   district as a whole are effectively below the guidelines.  We

16   went through the numbers and we did that in our reply.

17          In this district it is actually fewer are attributable

18   to 5K that as a percentage than anywhere in the country.  It is

19   judges exercising their discretion under 3553 (a) and taking

20   the mandate of sufficient but not greater than necessary, of

21   looking at the four elements of sentencing and the seven

22   factors.

23          When I say the elements, you know, the punishment,

24   deterrence, rehabilitation, incapacitation, that those four

25   plus the seven factors plus the parsimony clause, taking those

1    together, you find sentences well below the guidelines, and

2    sentences below the guidelines, I think here that's what is

3    appropriate.

4            THE COURT:  All right.  Mr. Taylor, is there anything

5    you want to say before the court imposes sentence?

6            THE DEFENDANT:  Your Honor, I just want to say on

7    behalf of Mr. Dratel and Ms. Lewis, I want to thank them for

8    defending me to the best of their ability and I want to say

9    what is done is done.

10           THE COURT:  I am sorry?  I can't hear you.

11           THE DEFENDANT:  I want to think Mr. Dratel and Ms.

12   Lewis for defending me to the best of their ability.  I am not

13   disputing my past history.  We all know.  I just want to say I

14   apologize, and like my lawyer said, Mr. Dratel has said, I

15   did -- I am a little nervous.  Excuse me.

16           THE COURT:  You take as long as you need.

17           Let me tell you what I would like to hear from you,

18   and that is why should I believe it is going to be any

19   different this time.  You have been sentenced now -- this is

20   your fifth sentencing.  You haven't gotten the message up till

21   now.  Mr. Dratel says you matured a lot, but the fundamental

22   question is why should I believe it is going to be any

23   different this time given what has happened in the past?

24           THE DEFENDANT:  Your Honor, I realize what it is, I

25   focus on which is my family, my daughter, my son, and I can't

1   keep putting them through this because I would be selfish if I

2   keep putting them through this.

3           I realize now I know what it is I have to do to make a

4   difference, and I will.  If I get sentenced to lesser time, it

5   is not my decision, but I will change because I know what I

6   have to do in the future to make a difference, and I will.  I

7   read a lot.  I have a lot of time to myself, and what don't

8   kill me will make me stronger.

9           Like I said, I been reading a lot lately, and a lot of

10  time I do, I do know, like I said, I do know and I take blame

11  and responsibility for what I have done in the past, and the

12  only thing I can say now is that what is done is done.  If, if

13  the court is -- I would like to get out there and make a

14  difference.  There is a lot of things I want to do as far as

15  going back to school and obtaining my GED and taking on

16  business administration.  I set aside the constantly put

17  negativity before anything.  Like I said, I am done because I

18  can't go, if I come through this again, I will be being selfish

19  to my family, and they've been supporters to me through --

20  since day one, since all my kids, I can't keep putting them

21  through this.

22          That is all I want to say.  I apologize and I beg

23  thank you for hearing me and thank my lawyers defending me to

24  the best of their ability.

25          THE COURT:  Mr. Dratel, what is the status of the

1    state case?

2            MR. DRATEL:  I think they're still in pretrial context

3    and I have been in contact with the state lawyer.  I guess

4    they're also waiting to see what happens here.

5            THE COURT:  All right.  You may be seated.

6            Mr. Poscablo, is there anything you want to say on

7    behalf of the government?

8            MR. POSCABLO:  Your Honor, I think that the government

9    put in, as the court knows, we put in a submission that I think

10   lays out the government's position in regards to what would be

11   an appropriate sentence in this case.  I think we made it clear

12   that the career offender guidelines we think, at least our

13   position is it is specifically aimed at individuals like this

14   defendant in this case who has a history of chronic drug

15   dealing in particular.

16           Unless the court has any further questions for the

17   government, we'll rest on our papers.

18           THE COURT:  In deciding upon an appropriate sentence,

19   I have considered all of the factors listed in 18 United States

20   Code Section 3553 (a), including the nature and circumstances

21   of Mr. Taylor's offense, his personal history and

22   characteristics, the need for the sentence imposed to reflect

23   the seriousness of the offense, to promote respect for the law,

24   to provide just punishment and to afford adequate deterrence.

25           Beginning with the nature and circumstances of the

CBSJTAYS                    Sentence

offense, the case involves a crack cocaine transaction in the

Frederick Douglas Houses in the Upper West Side of Manhattan.

After a three-day trial, the jury convicted Mr. Taylor of

conspiring to distribute, and possess with intent to

distribute, crack cocaine as well as the substantive offense of

distribution, and possession with intent to distribute crack

cocaine.

        I will briefly summarize the evidence at trial.  On

March 21st, 2011, an undercover officer posing as a crack

cocaine user approached Mr. Taylor's co-conspirator, Leonard

Fitzgerald, on West 103rd Street between Broadway and Amsterdam

Avenue and asked him to contact an individual who went by the

nickname Jay.

        The government contends that this is the defendant's

nickname.  Fitzgerald said he knew Jay from the projects.  A

reasonable jury could have found that Mr. Fitzgerald then

called Mr. Taylor and arranged for a sale of four dime bags of

crack cocaine.

        After the call, the undercover officer gave Fitzgerald

$40 in prerecorded buy money with which to purchase the crack

cocaine from Taylor.  Police observed Fitzgerald meet Taylor,

and the two engaged in a short conversation before walking into

860 Columbus Avenue, a building in the Frederick Douglas

Houses.

        A short time later Fitzgerald exited the building,

CBSJTAYS                         Sentence

advised the undercover officer that he had obtained the crack.
Fitzgerald then gave the undercover officer four small ziplock
bags of crack cocaine.  He was then arrested.

Shortly thereafter, police observed Taylor and another
man standing in front of 860 Columbus Avenue.  Taylor was seen
handing the man, the other man, a clear bag containing small
dark-colored ziplock bags, the type of packaging associated
with crack cocaine.  The other man tucked the bag into his shoe
or sock.  The police approached the other man who fled
ultimately into Central Park.  Police gave chase, but he was
not apprehended.

Mr. Taylor was arrested at the scene.  Police searched
the jacket he was wearing, recovered $45, including the $40 in
prerecorded buy money that the undercover officer had provided
to Fitzgerald who purchased the crack cocaine.

After the trial, Mr. Taylor moved for a judgment of
acquittal on Count 1 and for a new trial on Count 2.  I denied
that motion in its entirety.  In my judgment, the evidence of
the defendant's guilt at trial was quite strong given the
police observations and Mr. Taylor's possession of the
prerecorded buy money.

With respect to Mr. Taylor's personal history and
characteristics, he is 25 years' old.  Despite his relative
youth, he has a significant criminal record.  He has, as I
indicated, four prior drug trafficking convictions, three

1  felonies and one misdemeanor.  In 2006, at age 19, Mr. Taylor

2  was convicted of criminal possession of a narcotic in the

3  fourth degree and was sentenced to five years of probation.

4  Within three months he was convicted of criminal sale of a

5  controlled substance in the fourth degree and criminal

6  possession of a controlled substance in the third degree.  On

7  the latter crime, he received a sentence of 42 months

8  imprisonment.

9          Within 10 days of being released on parole in 2010,

10  Mr. Taylor was arrested again and convicted shortly thereafter

11  for criminal possession of a controlled substance in the 7th

12  degree.  About six months after serving his sentence on that

13  crime, he was arrested in this case.

14          Mr. Taylor currently faces a charge in New York County

15  Supreme Court of intentional murder.  I should say that charge

16  has played no role in my sentencing determination because I

17  have no idea whether Mr. Taylor committed the crime.  I will

18  say that at an earlier point in the proceedings it was brought

19  to my attention that the police targeted Mr. Taylor for this

20  undercover buy because they believed he had information about a

21  homicide.  It now appears the police have switched from viewing

22  him as a witness to a perpetrator.  As I have said, I have no

23  information as to whether or not he committed this murder; and,

24  therefore, this arrest and charge played no role in my

25  sentencing determination.

1          Mr. Taylor was born in New York and is one of 9

2     children.  He had a difficult childhood.  According to

3     Mr. Taylor's sister, he and his siblings were removed from

4     their mother's care when Mr. Taylor was three or four years'

5     old and placed in foster care due to abuse, neglect and their

6     mother's alcoholism.  According to Mr. Taylor's sister, she and

7     most of her siblings were abused while in foster care.  Mr.

8     Taylor and his siblings ultimately moved in with their

9     grandmother in the Frederick Douglas Houses.  Mr. Taylor's

10    grandmother later died, which was a devastating event for him

11    as well as his siblings.

12          After the grandmother's death, Mr. Taylor moved in

13    with a godmother.  However, the sister reports that Mr. Taylor

14    spent additional time in foster care as a teenager.  It is

15    clear Mr. Taylor's childhood was unstable and a shuttle between

16    foster homes and homes of relatives.  At the time of his

17    arrest, he was living with one of his sisters.

18          Mr. Taylor and his fiance have a daughter who was born

19    while Mr. Taylor was in custody on these offenses.  He also has

20    a four-year old son from a prior relationship.  Mr. Taylor has

21    a history of marijuana use which began when he was 11 years'

22    old, apparently smoked marijuana every other day.  He dropped

23    out of school at 11th grade.  He was a special education

24    student while in the school system.  He was diagnosed with

25    attention deficit disorder and was prescribed medication for

1    that condition as well as certain behavioral problems.

2            Mr. Taylor was unemployed between 2005 and his arrest

3    on March 11th, 2011.  Given his criminal record, it is a fair

4    inference that apart from periods of incarceration, he

5    supported himself through drug trafficking.

6            In determining Mr. Taylor's sentence, Section 3553 (a)

7    of Title 18 requires that I avoid unwarranted sentencing

8    disparities.  In preparation for today's sentence, I have

9    obtained information from the Sentencing Commission concerning

10   the treatment of career offenders in this district, in this

11   circuit and throughout the country.  My focus has been somewhat

12   different than the focus of the parties.

13           I have inquired not about the general rates of

14   departure or variance and not about the general rates of

15   departure or variance as to career offenders.  What I was

16   particularly interested in was how defendants who are

17   classified as career offenders were treated when they had the

18   same base offense level as this particular defendant.  These

19   statistics tell us how courts treat defendants who commit

20   relatively minor crimes, but because of their criminal record,

21   qualify as career offenders.  This is what I found.

22           Nationwide, defendants with a base offense level of

23   12, which is the base offense level that applies here absent

24   application of the career offender provision, such defendants

25   who qualify as career offenders were sentenced below the range,

that is, below the range provided as a result of the career

offender provision more than 70 percent of the time.

    In about 44 percent of all the cases, the government

had not sought a non-guideline sentence.  The average reduction

with respect to these non-government sponsored reductions was

about 100 months imprisonment or about a 40 percent reduction

from the range provided for as a result of career offender.

    I then looked nationwide at crack offenders who were

at base Offense Level 12 and who had a criminal history score,

range of between 7 and 9.  In other words, I looked at

defendants with a record very similar to Mr. Taylor's.

    Nationwide, 81 percent of the time these defendants

were sentenced below the range.  About 55 percent of the time

this happened even though the government had not recommended a

reduction.  The average reduction was 102 months in these

non-government sponsored reduction cases.  That amounts to

about a 38 percent reduction.

    I then looked at cases in the Second Circuit, again at

defendants who are at base Offense Level 12 who were

nonetheless career offenders.  The numbers were small, but 75

percent of the time there was a non-guideline sentence.  In all

of these cases the reduction was not sponsored by the

government.  The average reduction was 86 months or about a 48

percent reduction.

    I then looked at the Southern District of New York

again for defendants who would otherwise be at a base offense

level of 12.  The numbers, of course, are even smaller, but in

100 percent of the cases there was a sentence below the range.

The average reduction was 52 months, which in those cases

amounted to an average reduction of 68 percent.

None of these cases involved a government-sponsored

reduction.  These statistics tell me that judges nationwide, in

this circuit and in this district, have been extremely

reluctant to impose a career offender range on defendants with

a background similar to Mr. Taylors.  Indeed, nationwide, in

this circuit and in this district, a majority of judges have

refused to do so.

As we all know, the guidelines here recommend a

sentence of between 262 and 327 months imprisonment.  That is a

range of nearly 22 years to 27 years.  The Probation Department

recommends a sentence of 262 months.  The government seeks a

guideline sentence.

Defense counsel has argued that Mr. Taylor should not

be treated as a career offender and that instead he should be

sentenced in accordance with the range that would have been

applicable but for career offender status.  That range is 21 to

27 months imprisonment.

I have considered whether a downward departure here is

appropriate, and I have decided I will not exercise my

discretion to grant a downward departure.  The Second Circuit

has made clear that a downward departure is not warranted in

connection with a career offender merely because the defendant

is a street-level dealer, citing united States versus versus

Misho, 241 F.3d 214, at 219 (2d Cir. 2009).

In that case the Second Circuit makes clear that there

is, "no generalized exception for street-level drug selling,"

with respect to the career offender provision.  I have

considered Mr. Taylor's prior offenses, his role in those

offenses, the sentences that were previously imposed and the

amount of time he served and have concluded that a departure

based on these factors is not warranted.

I cannot say that a downward departure from career

offender treatment is appropriate for Mr. Taylor given his

commission of four prior drug trafficking crimes, including

three felonies and the circumstances of those offenses.

18 U.S. Code Section 3553 (a)(5) requires me to

consider any pertinent policy statements in the guidelines.

Section 4A1.3 (b)(1) is relevant in that regard.  It provides,

and I quote:

"If reliable information indicates the defendant's

criminal history category substantially overrepresents the

seriousness of the defendant's criminal history or the

likelihood that the defendant will commit other crimes, a

downward departure may be warranted."

As Mr. Dratel has pointed out, Section 4A1.3 (b)(3)(A)

1  limits this directive by stating that, "the extent of a

2  downward departure under this subsection for a career offender

3  within the meaning of Section 4B1.1 may not exceed one criminal

4  history category."

5          I have concluded that no departure is warranted under

6  Section 4A1.3 (b) because I believe that Mr. Taylor presents an

7  extremely high risk of recidivism and that his criminal history

8  category does not substantially overrepresent the seriousness

9  of his criminal history.  The record is abundantly clear that

10 Mr. Taylor has been selling crack in and around the Frederick

11 Douglas Houses for the past six years when he was not

12 incarcerated.

13         The prior prosecutions and convictions and even a

14 substantial term of imprisonment and court supervision in the

15 form of parole have not deterred him from going right back to

16 selling crack in the same area.

17         I also reject the notion that a street-level dealer

18 like Mr. Taylor has no substantial effect on the community.  It

19 is people like Mr. Taylor who ruin public housing projects for

20 the majority of tenants who want to live and raise their

21 children in a safe, crime-free area, not in an illegal drug

22 marketplace.  I conclude no departure under the guidelines is

23 appropriate.

24         I have also considered all of the other factors that

25 Mr. Dratel has put forth as a basis for a departure under the

CBSJTAYS                          Sentence

1    guidelines, including Mr. Taylor's difficult childhood, the

2    effect of his incarceration on his children, the disparity in

3    penalties compared to the state system, the conditions at the

4    MCC.  I conclude that none of these factors are so

5    extraordinary as to warrant a departure.  Indeed, most if not

6    all of these arguments could and have been made on behalf of

7    many other defendants.

8           That brings me to whether a variance is appropriate,

9    an inquiry that requires me to consider all of the factors set

10   forth in 18 United States Code Section 3553 (a) and the

11   parsimony principle, that is, what is the least amount of

12   imprisonment that will serve all of the purposes of sentencing.

13          The government has asked me to impose a sentence of

14   between nearly 22 years and 27 years on a person aged 25 who

15   sold in this case less than 1.4 grams of crack and who has

16   never been convicted of selling a substantial amount of

17   narcotics.  A sentence of between 22 and 27 years would be

18   longer than what many violent felonies receive.  In my

19   judgment, a sentence within this range is wildly more than

20   necessary to serve all the purposes of sentencing and to

21   constitute a serious miscarriage of justice.

22          In my view, in a case that does not involve violence

23   or drug dealing on a large scale and in a case that involves a

24   relatively young man who has never served a period of

25   incarceration greater than about two years, much less a term of

imprisonment approaching the range at issue here, a judge must

think long and hard before taking away from such a defendant a

significant percentage of the rest of his life.

It is in my view a fair case that would justify such a

sentence.  Such a sentence would be appropriate where a

defendant is beyond redemption, where there is no chance of

rehabilitation, where incarceration for decades is necessary to

protect the community because there is little or no chance that

the defendant will ever reform.  There is no record here on

which I can base such a conclusion.

This man is 25 years' old.  He has made a lot of bad

choices.  He has been unwilling to abide by the law, but I

can't find, based on what he has done so far, it is necessary

to lock him away for the next 22 to 27 years either to achieve

deterrence or to protect the community.

It is equally clear to me a sentence between 21 and 27

months imprisonment is not appropriate.  Such a sentence would

not address the defendant's repeated flouting of the law and

would not deter the defendant.  As I noted in December 2007, he

was sentenced to 42 months in prison.  That sentence had no

effect.  10 days after his release on parole, the defendant was

arrested on another drug crime.  So it is obvious to me a

sentence between 21 and 27 months would not be effective, would

not serve all the purposes of Section 3553 (a), and then indeed

the sentence must be much longer than the 42 month sentence the

1    defendant received back in December 2007.

2           Only a sentence of that magnitude is likely to have

3    the deterrent effect necessary to persuade the defendant that

4    he will no longer be permitted to sell drugs in and around the

5    Frederick Douglas Houses.  The sentence imposed has to be

6    sufficient to derail what has been persistent criminal

7    activity, interrupted only by occasional periods of

8    incarceration.

9           With these facts in mind, I will now describe the

10   sentence I intend to impose and ask the parties if they have

11   anything further they wish to say.

12          With respect to the imprisonment, I intend to impose

13   sentence of 84 months of imprisonment on each count of the

14   indictment to run concurrently.  I conclude that this amount of

15   imprisonment is sufficient to satisfy all the purposes of

16   sentencing set forth in Section 3553 (a).

17          With respect to supervised release, I intend to impose

18   a sentence of six years on each count, to run concurrently.  I

19   intend to impose the following mandatory conditions of

20   supervision:  The defendant shall not commit another federal,

21   state or local crime, he shall not illegally possess a

22   controlled substance, he shall not possess a firearm or

23   destructive device, he shall cooperate in the collection of DNA

24   as directed by the probation officer.  It is my intention to

25   suspend the mandatory drug testing condition in favor of

CBSJTAYS                        Sentence

imposition of a special condition requiring drug treatment and

testing.

I intend to impose the first 13 standard conditions of

supervised release as well as the following special conditions:

The defendant will participate in a program approved

by the United States Probation Office to include testing to

determine whether he has reverted to the use of drugs.  The

court authorizes the release of available drug treatment

evaluations and reports to the substance abuse provider as

approved by the probation officer.

The defendant shall participate in a mental health

program if deemed necessary and approved by the U.S. Probation

Office.  He shall continue to take any prescribed medications

unless otherwise instructed by his health care provider.  I

authorize the release of available psychological and

psychiatric evaluations and reports to the health care

provider.

The defendant shall submit his person, residence,

place of business, vehicle or any other premises under his

control to a search, on the basis the probation officer has a

reasonable belief that contraband or evidence of a violation of

the conditions of his release may be found.  The search must be

conducted at a reasonable time and in a reasonable manner.

Failure to submit to a search may be grounds for revocation.

The defendant shall inform any other residents that the

CBSJTAYS                        Sentence

1    premises may be subject to search pursuant to this condition.

2            The defendant is to report to the nearest Probation

3    Office within 72 hours of release from custody.  I do not

4    intend to impose a fine because I find the defendant lacks the

5    ability to pay a fine.  I am required to impose a $200.00

6    special assessment.

7            Mr. Poscablo, is the government seeking an order of

8    forfeiture?

9            MR. POSCABLO:  It is not, your Honor.

10           THE COURT:  Mr. Dratel, anything further you wish to

11   say?

12           MR. DRATEL:  If your Honor could recommend the RDAP

13   program, the Bureau of Prisons drug treatment program for Mr.

14   Taylor, as we requested in our papers, and also an institution

15   as close as possible given the Bureau of Prisons

16   considerations, close as possible to metropolitan area to

17   facilitate family visits.

18           THE COURT:  All right.  Mr. Taylor, anything further

19   your wish to say?

20           THE DEFENDANT:  No, sir.

21           THE COURT:  Mr. Poscablo, anything further from the

22   government?

23           MR. POSCABLO:  No, your Honor.

24           THE COURT:  Mr. Taylor, for the reasons I just stated,

25   it is the judgment of this Court you be sentenced to 84 months

imprisonment, six years of supervised release on each count to

run concurrently.  You will be subject to the mandatory

standard and special conditions I just mentioned.  You are

ordered to pay a special assessment in the amount of $200.00.

After you serve your period of incarceration, you will

be released on supervised release and you will be subject to

the conditions I described.  You should be aware if you violate

those conditions, you will be brought back before me for the

purposes of sentencing, and I can assure you now, and I want

you to remember for all time, that if I see you again and you

have violated the conditions of your release and in particular

if you have gone back to selling drugs, you can expect no mercy

from me.  Do you understand me?

THE DEFENDANT:  Yes, sir.

THE COURT:  I recommend to the Bureau of Prisons Mr.

Taylor be admitted to the residential drug and alcohol program.

Given Mr. Taylor's long-time use of marijuana, he has a

compelling need for drug treatment.

I further recommend to the Bureau of Prisons the

defendant be incarcerated as close as possible to the New York

Metropolitan Area so that he may maintain ties with his family

during this period of incarceration.

Mr. Taylor, I am required to advise you of your appeal

rights.  You can appeal your conviction if you believe that

your guilty plea was unlawful or involuntary or if there was

CBSJTAYS                         Sentence

some other fundamental defect in the proceedings that was not

waived by your guilty plea.  You also have a statutory right to

appeal your sentence under certain circumstances.  With few

exceptions, any notice of appeal must be filed within 10 days

of judgment being entered in your case.

          Judgment will likely be entered tomorrow.  Mr. Dratel

will discuss with you whether or not you wish to file a notice

of appeal.  If you're not able to pay the costs of an appeal,

you may apply for leave to appeal in forma pauperis.  If you

request, the Clerk of the Court will prepare and file a notice

of appeal on your behalf.

          Is there anything further?

          MR. POSCABLO:  Not from the government.

          MR. DRATEL:  No, your Honor.

          THE COURT:  I do want to say that representation of

Mr. Taylor I thought was quite extraordinary in the case.  No

stone was left unturned either at trial or during the

sentencing phase.  It is my judgment that no lawyer, I should

say today, no lawyers could have done more for Mr. Taylor than

has been done here and that counsel performed at a very high

professional level throughout.

          We are adjourned.

          (Court adjourned)